[No. S097600. June 30, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
JAY SHAWN JOHNSON, Defendant and Appellant.

1304

COUNSEL

Stephen B. Bedrick, under appointment by the Supreme Court, for Defendant and Appellant.

Bradley A. Bristow for California Public Defenders Association as Amicus Curiae on behalf of Defendant and Appellant.

Lynne S. Coffin, State Public Defender, Raoul D. Schonemann, Deputy State Public Defender; and Alan L. Schlosser for Office of the State Public Defender and American Civil Liberties Union of Northern California as Amici Curiae on behalf of Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner and Robert R. Anderson, Chief Assistant Attorneys General, Ronald A. Bass and Gerald A. Engler, Assistant Attorneys General, Martin S. Kaye, Richard Rochman, Ronald S. Matthias, Catherine A. McBrien, Laurence K. Sullivan and Seth K. Schalit, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

CHIN, J.—During jury selection, each party is entitled to a limited number of peremptory challenges. (Code Civ. Proc., § 231.) However, exercising peremptory challenges to remove prospective jurors solely because of group bias, for example, on racial grounds, violates both the California Constitution (*People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d

748] (*Wheeler*)) and the United States Constitution (*Batson v. Kentucky* (1986) 476 U.S. 79 [106 S.Ct. 1712, 90 L.Ed.2d 69] (*Batson*)). Both *Wheeler* and, later, *Batson* established procedures for courts to follow when one party objects to the other party's peremptory challenges. Defendant contends that California's procedures violate *Batson* in two respects.

■ First, although both *Wheeler* and *Batson* require the objector to establish a prima facie case of discriminatory use of peremptory challenges before the other party must explain its challenges, *Wheeler* used two terms— "strong likelihood" and "reasonable inference"—to describe the necessary showing of group bias; *Batson* used the single term, "an inference of discriminatory purpose." (*Batson, supra,* 476 U.S. at p. 94 [106 S.Ct. at p. 1721]; *Wheeler, supra,* 22 Cal.3d at pp. 280-281.) Defendant argues that the "strong likelihood" standard states a different, and higher, requirement for establishing a prima facie case than *Batson* permits.

■ Second, we have observed that comparing, for the first time on appeal, the answers of excused jurors with those of jurors not excused to determine whether the trial court erred in denying an objection to the use of peremptory challenges is unreliable and fails to give due deference to the trial court's ruling. (E.g., *People v. Box* (2000) 23 Cal.4th 1153, 1190 [99 Cal.Rptr.2d 69, 5 P.3d 130]; *People v. Montiel* (1993) 5 Cal.4th 877, 909 [21 Cal.Rptr.2d 705, 855 P.2d 1277]; *People v. Johnson* (1989) 47 Cal.3d 1194, 1220-1222 [255 Cal.Rptr. 569, 767 P.2d 1047].) Defendant contends that this rule against "comparative juror analysis" violates *Batson*.

■ We conclude that *Wheeler*'s terms, a "strong likelihood" and a "reasonable inference," refer to the same test, and this test is consistent with *Batson*. Under both *Wheeler* and *Batson*, to state a prima facie case, the objector must show that it is more likely than not the other party's peremptory challenges, if unexplained, were based on impermissible group bias. ■ We also conclude that *Batson* does not require state reviewing courts to engage in comparative juror analysis for the first time on appeal. Finally, applying California's procedures, which satisfy *Batson*, to this case, we uphold the trial court's finding that defendant failed to establish a prima facie case that the prosecutor used his peremptory challenges improperly.

Accordingly, we reverse the judgment of the Court of Appeal, which reached contrary conclusions.

## I. FACTS AND PROCEDURAL HISTORY

A jury found defendant guilty of the second degree murder of the 19-month-old daughter of his girlfriend and of assault resulting in the death of

a child under the age of eight. (Pen. Code, §§ 187, 273ab.) The issues before us solely involve jury selection, so we focus on that process.

The district attorney exercised 12 peremptory challenges. He used three of them to challenge all three African-American prospective jurors on the jury panel—C.T., S.E., and R.L. After the second of these challenges, defendant made a "*Wheeler* motion." (*Wheeler, supra,* 22 Cal.3d 258.) He stated that his motion "[m]ore specifically . . . concerns [S.E.], the last individual who was eliminated by the People." He argued the prosecutor had no apparent reason to challenge this prospective juror "other than [her] racial identity." He made no argument regarding C.T. The court responded that "based on the record that's been made, [it] would find that there's not been shown a strong likelihood that the exercise of the peremptory challenges were based upon a group rather than an individual basis. The Court has to start from the position of a premise that the exercises of the peremptory challenges were based on constitutional grounds." The court also told the district attorney, however, that "we are very close."

After the third of these challenges, defendant renewed his *Wheeler* motion. Focusing this time on the most recent challenge, he based his motion on the circumstance that the district attorney had removed all of the African-American prospective jurors. The court denied the motion in a detailed ruling. Regarding the most recent challenge, the court stated that it had had "concerns with regard to her qualifications in this matter based upon her answers on the questionnaire; specifically, the Court had noted that she had a sister who had had drug charges, although her answers in follow-up verbally were such that the Court would not have found that the issues were such to lead to a challenge for cause. May be sufficient to justify a peremptory challenge by the People. [¶] Also, with regard to her answers generally on the questionnaire itself, there was an indication that she had difficulty understanding some of the issues, and specifically, her last response which was somewhat rambling on the questionnaire indicated that she herself felt that she had difficulty understanding things. Again, her verbal responses here in court were such that I would not have granted a challenge for cause on that basis, but the Court felt that the answers on the questionnaire were sufficient that they certainly would have justified a peremptory challenge by either side, frankly, based upon the concerns about her ability to understand the proceedings."

The court noted the rest of the district attorney's challenges were against "all other types of groups, including white women and white men as well." Regarding S.E., the court stated that it had been concerned about her, "including the answer on question thirty that she gave verbally here in court

that she had not included in her questionnaire; a parent had a robbery or arrest, even though that was a number of years ago, thirty years ago. Her answers on the record were not as such that I would have granted a challenge for cause. Certainly, they could justify a challenge by the People. [¶] She expressed on the record that she didn't know if she could be fair. Her verbal follow-up responses were not such that I would have granted a challenge for cause. And also based upon the answers with regard to question sixty-three . . . her emotions and feelings, again, her answers were such that they may have caused concern for either side. Even though the answers tend to lean in the favor of the prosecution in the case, neither side would want a juror deciding a case based upon emotions, rather than the facts and the evidence." "In summary," the court said, "with regard to the jurors, while the Court would not grant the challenges for cause, there were answers . . . at least on the questionnaires themselves such that the Court felt that there was sufficient basis for the peremptory challenge. [¶] Even with the addition of [the most recent challenge], the Court will not find a prima facie case."

The Court of Appeal reversed the judgment. It found that the "strong likelihood" standard the trial court applied violated *Batson, supra*, 476 U.S. 79. Based primarily on its own comparison of answers the challenged jurors gave with answers of nonchallenged jurors, the court concluded that "a prima facie case of group bias was established and that the judgment must therefore be reversed." Justice Haerle dissented on all points.

We granted the Attorney General's petition for review.

## II. DISCUSSION

### A. *Background*

■ Exercising peremptory challenges because of group bias rather than for reasons specific to the challenged prospective juror violates both the California Constitution and the United States Constitution. (*Batson, supra*, 476 U.S. 79; *Wheeler, supra*, 22 Cal.3d 258.) Because *Wheeler* predated *Batson*, the *Wheeler* court obviously did not have the benefit of *Batson* in establishing the procedures to follow in California. Defendant argues that California's procedures violate *Batson* in two respects: (1) *Wheeler*'s "strong likelihood" standard, or at least the way it was understood and applied in later cases, is a higher standard than *Batson* permits; and (2) California law impermissibly restricts comparative juror analysis. We discuss these contentions in order below, then review the trial court's rulings. But first, to fully understand these issues, it is necessary to review *Wheeler* and *Batson* in detail.

## 1. *Wheeler*

In *Wheeler*, we concluded "that the use of peremptory challenges to remove prospective jurors on the sole ground of group bias violates" the California Constitution. (*Wheeler, supra*, 22 Cal.3d at p. 276.) We then turned to the difficult question of what to do when one party objects to the other party's peremptory challenges on this basis. We began "with the proposition that in any given instance the presumption must be that a party exercising a peremptory challenge is doing so on a constitutionally permissible ground. . . . [¶] Yet it is only a presumption, and must be rebuttable if the foregoing constitutional right is not to be nullified even by honest zeal. The issue is what showing is necessary to rebut it. We must define a burden of proof which a party may reasonably be expected to sustain in meritorious cases, but which he cannot abuse to the detriment of the peremptory challenge system." (*Id.* at p. 278.)

We adopted the following procedure: "If a party believes his opponent is using his peremptory challenges to strike jurors on the ground of group bias alone, he must raise the point in timely fashion and make a prima facie case of such discrimination to the satisfaction of the court. First, . . . he should make as complete a record of the circumstances as is feasible. Second, he must establish that the persons excluded are members of a cognizable group within the meaning of the representative cross-section rule. Third, from all the circumstances of the case he must show a strong likelihood that such persons are being challenged because of their group association rather than because of any specific bias." (*Wheeler, supra*, 22 Cal.3d at p. 280, fn. omitted.) We discussed types of evidence the objector may present to make this showing. "[T]he party may show that his opponent has struck most or all of the members of the identified group from the venire, or has used a disproportionate number of his peremptories against the group. He may also demonstrate that the jurors in question share only this one characteristic— their membership in the group—and that in all other respects they are as heterogeneous as the community as a whole. Next, the showing may be supplemented when appropriate by such circumstances as the failure of his opponent to engage these same jurors in more than desultory voir dire, or indeed to ask them any questions at all. Lastly, . . . the defendant need not be a member of the excluded group in order to complain of a violation of the representative cross-section rule; yet if he is, and especially if in addition his alleged victim is a member of the group to which the majority of the remaining jurors belong, these facts may also be called to the court's attention." (*Id.* at pp. 280-281, fn. omitted.)

We then discussed what the court must do. "Upon presentation of this and similar evidence—in the absence, of course, of the jury—the court must

determine whether a reasonable inference arises that peremptory challenges are being used on the ground of group bias alone. We recognize that such a ruling 'requires trial judges to make difficult and often close judgments. They are in a good position to make such determinations, however, on the basis of their knowledge of local conditions and of local prosecutors.' [Citation.] They are also well situated to bring to bear on this question their powers of observation, their understanding of trial techniques, and their broad judicial experience. We are confident of their ability to distinguish a true case of group discrimination by peremptory challenges from a spurious claim interposed simply for purposes of harassment or delay.

"If the court finds that a prima facie case has been made, the burden shifts to the other party to show if he can that the peremptory challenges in question were not predicated on group bias alone. The showing need not rise to the level of a challenge for cause. But to sustain his burden of justification, the allegedly offending party must satisfy the court that he exercised such peremptories on grounds that were reasonably relevant to the particular case on trial or its parties or witnesses—i.e., for reasons of specific bias as defined herein. He, too, may support his showing by reference to the totality of the circumstances: for example, it will be relevant if he can demonstrate that in the course of this same voir dire he also challenged similarly situated members of the majority group on identical or comparable grounds. And again we rely on the good judgment of the trial courts to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination.

"If the court finds that the burden of justification is not sustained as to any of the questioned peremptory challenges, the presumption of their validity is rebutted." (*Wheeler, supra*, 22 Cal.3d at pp. 281-282, fn. omitted.)

### 2. *Batson*

In *Batson*, the United States Supreme Court held that principles of equal protection "forbid discrimination on account of race in selection of the petit jury." (*Batson, supra*, 476 U.S. at p. 88 [106 S.Ct. at p. 1718].) It, too, discussed what to do when one party objects to the other party's peremptory challenges. "As in any equal protection case, the 'burden is, of course,' on the defendant who alleges discriminatory selection of the venire 'to prove the existence of purposeful discrimination.' [Citations.] In deciding if the defendant has carried his burden of persuasion, a court must undertake 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.' [Citation.] Circumstantial evidence of invidious intent may be proof of disproportionate impact. [Citation.] We have observed that

under some circumstances proof of discriminatory impact 'may for all practical purposes demonstrate unconstitutionality because in various circumstances the discrimination is very difficult to explain on non-racial grounds.' [Citation.] For example, 'total or seriously disproportionate exclusion of Negroes from jury venires,' [citation] 'is itself such an "unequal application of the law . . . as to show intentional discrimination," ' [citations]." (*Id.* at p. 93 [106 S.Ct. at p. 1721].)

A party alleging discriminatory use of peremptories "may make out a prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose. [Citation.] Once the defendant makes the requisite showing, the burden shifts to the State to explain adequately the racial exclusion." (*Batson, supra,* 476 U.S. at pp. 93-94 [106 S.Ct. at p. 1721].) In a footnote, the court stated that its "decisions concerning 'disparate treatment' under Title VII of the Civil Rights Act of 1964 have explained the operation of prima facie burden of proof rules. See *McDonnell Douglas Corp.* v. *Green,* 411 U.S. 792 [93 S.Ct. 1817, 36 L.Ed.2d 668] (1973); *Texas Dept. of Community Affairs* v. *Burdine,* 450 U.S. 248 [101 S.Ct. 1089, 67 L.Ed.2d 207] (1981); *United States Postal Service Board of Governors* v. *Aikens,* 460 U.S. 711 [103 S.Ct. 1478, 75 L.Ed.2d 403] (1983). The party alleging that he has been the victim of intentional discrimination carries the ultimate burden of persuasion. *Texas Dept. of Community Affairs* v. *Burdine, supra,* at 252-256 [101 S.Ct. at pp. 1093-1095]." (*Id.* at p. 94, fn. 18 [106 S.Ct. at pp. 1721-1722].)

The high court discussed in detail the "standards for assessing a prima facie case in the context of discriminatory selection of the venire . . . ." (*Batson, supra,* 476 U.S. at p. 96 [106 S.Ct. at p. 1723].) "[A] defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. To establish such a case, the defendant first must show that he is a member of a cognizable racial group [citation], and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race.[1] Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits

---

[1]Both *Wheeler, supra,* 22 Cal.3d 258, and *Batson, supra,* 476 U.S. 79, like this case, involved criminal defendants claiming prosecutors impermissibly challenged members of the defendants' own ethnic group. Other cases have expanded the prohibition into other circumstances. (E.g., *J.E.B.* v. *Alabama ex rel. T.B.* (1994) 511 U.S. 127 [114 S.Ct. 1419, 128 L.Ed.2d 89] [gender]; *Georgia* v. *McCollum* (1992) 505 U.S. 42 [112 S.Ct. 2348, 120 L.Ed.2d 33] [defendant's exercise of peremptory challenges]; *Edmonson* v. *Leesville Concrete Co., Inc.* (1991) 500 U.S. 614 [111 S.Ct. 2077, 114 L.Ed.2d 660] [civil cases]; *Powers* v. *Ohio* (1991) 499 U.S. 400 [111 S.Ct. 1364, 113 L.Ed.2d 411] [defendant need not be member of the

'those to discriminate who are of a mind to discriminate.' [Citation.] Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empanelling of the petit jury . . . raises the necessary inference of purposeful discrimination.

"In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances. For example, a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose. These examples are merely illustrative. We have confidence that trial judges, experienced in supervising *voir dire*, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors." (*Batson, supra,* 476 U.S. at pp. 96-97 [106 S.Ct. at p. 1723].)

"Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors. . . . The prosecutor . . . must articulate a neutral explanation related to the particular case to be tried. The trial court then will have the duty to determine if the defendant has established purposeful discrimination." (*Batson, supra,* 476 U.S. at pp. 97-98 [106 S.Ct. at p. 1723], fns. omitted.) In a footnote, the court also stated, "Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." (*Id.* at p. 98, fn. 21 [106 S.Ct. at p. 1724].)

In rejecting an argument that its holding could create serious administrative difficulties, the high court noted that "[i]n those States applying a version of the evidentiary standard we recognize today," courts have not experienced these difficulties. (*Batson, supra,* 476 U.S. at p. 99 [106 S.Ct. at p. 1724].) "For example, in *People v. Hall,* 35 Cal.3d 161, 672 P.2d 854 (1983), the California Supreme Court found that there was no evidence to show that procedures implementing its version of this standard, imposed five years earlier, were burdensome for trial judges." (*Id.* at p. 99, fn. 23 [106 S.Ct. at p. 1724].)

B. *The Necessary Showing for a Prima Facie Case*

 *Wheeler* used both the terms "strong likelihood" and "reasonable inference" in describing the standard for a prima facie case. (*Wheeler, supra,*

excluded group]; *People v. Willis* (2002) 27 Cal.4th 811 [118 Cal.Rptr.2d 301, 43 P.3d 130] [defendant's exercise of peremptory challenges].) We need not consider these cases here.

22 Cal.3d at pp. 280, 281.) We believe it obvious that we considered the two terms to be different phrasing of the same standard. Language in a 1994 Court of Appeal decision, *People v. Bernard* (1994) 27 Cal.App.4th 458 [32 Cal.Rptr.2d 486], however, created some uncertainty. That case seemed to read the two terms as stating different standards, with "reasonable inference" being a lower standard than "strong likelihood." (*Id.* at p. 465.)

In *Wade v. Terhune* (9th Cir. 2000) 202 F.3d 1190, the court found that, at least after *People v. Bernard, supra,* 27 Cal.App.4th 458, "California state courts have applied a lower standard of scrutiny to peremptory strikes than the federal Constitution permits." (*Wade v. Terhune, supra,* at pp. 1196-1197.) The court noted also that, in recent years, this court has generally cited the "strong likelihood" language rather than the "reasonable inference" language. (*Id.* at p. 1197.) It believed that California courts give criminal defendants less protection than the United States Constitution requires "when they follow the *Wheeler* 'strong likelihood' test in determining whether a *prima facie* case has been established." (*Wade v. Terhune, supra,* at p. 1197.) In the court's view, "the *Wheeler* 'strong likelihood' test for a successful *prima facie* showing of bias is impermissibly stringent in comparison to the more generous *Batson* 'inference' test." (*Ibid.*) The court "therefore conclude[d] that California courts in following the 'strong likelihood' language of *Wheeler* are not applying the correct legal standard for a *prima facie* case under *Batson.*" (*Ibid.*)

Shortly after *Wade v. Terhune, supra,* 202 F.3d 1190, and in response to it, we reiterated that "in California, a 'strong likelihood' means a 'reasonable inference,'" and disapproved *People v. Bernard, supra,* 27 Cal.App.4th 458, "to the extent it is inconsistent with *People v. Wheeler, supra,* 22 Cal.3d at pages 280-281." (*People v. Box, supra,* 23 Cal.4th at p. 1188, fn. 7.) However, the Ninth Circuit Court of Appeals held that this action did not cure the problem it perceived, at least for cases tried after *Bernard* and before *Box* in which trial courts were "following *Bernard*'s take on *Wheeler.*" (*Cooperwood v. Cambra* (9th Cir. 2001) 245 F.3d 1042, 1047.) It said that "regardless" of our action in *People v. Box, supra,* at page 1188, footnote 7, "whenever state courts use the 'strong likelihood' standard, . . . these courts are applying a lower standard of scrutiny to peremptory strikes than the federal Constitution permits." (*Cooperwood v. Cambra, supra,* at p. 1047.) The majority below agreed and, accordingly, found that the trial court used an impermissible standard in determining whether defendant had established a prima facie case.

We reiterate what we implied in *Wheeler* and stated in *Box*: *Wheeler*'s terms "strong likelihood" and "reasonable inference" state the same standard. (*People v. Box, supra,* 23 Cal.4th at p. 1188, fn. 7; *Wheeler, supra,* 22

Cal.3d at pp. 280-281.) This has always been true, although we recognize that *People v. Bernard, supra,* 27 Cal.App.4th 458, may have created some uncertainty for a few years. But the important question for current purposes is not whether California courts have always viewed these terms as the same, but whether California's "strong likelihood" standard violates *Batson.* The *Wade v. Terhune* court and the majority below assumed that *Batson*'s inference test is "more generous" than *Wheeler*'s strong likelihood test without examining what the United State Supreme Court itself has said on the matter. (*Wade v. Terhune, supra,* 202 F.3d at p. 1197.) But to address this question, it is necessary to delineate exactly what the high court meant when it equated the necessary prima facie case with "an inference of discriminatory purpose." (*Batson, supra,* 476 U.S. at p. 94 [106 S.Ct. at p. 1721].) We believe the court has made its meaning clear.

The high court appears to have given other courts some flexibility in establishing the exact procedures to follow. "We decline, however, to formulate particular procedures to be followed upon a defendant's timely objection to a prosecutor's challenges." (*Batson, supra,* 476 U.S. at p. 99 [106 S.Ct. at pp. 1724-1725].) Thus, to some extent at least, *Batson* seems to have "left to lower courts the task of determining the type and quantum of proof necessary for a defendant to establish a prima facie case." (*State v. Duncan* (La. 2001) 802 So.2d 533, 545; see also Note, *Batson v. Kentucky and the Prosecutorial Peremptory Challenge: Arbitrary and Capricious Equal Protection?* (1988) 74 Va. L.Rev. 811, 817 ["The Supreme Court has left the lower courts to grapple with the proper implementation of the *Batson* test. They must determine not only the quantum of proof necessary for a defendant to establish a prima facie case but also the types of explanations sufficient to rebut the defendant's claim"].) But whatever flexibility the high court has left state courts, the California standard is not less generous than the test the *Batson* court itself applies to establish a prima facie case.

In *Batson,* the court stated that its decisions under title VII of the Civil Rights Act of 1964 "explained the operation of prima facie burden of proof rules." (*Batson, supra,* 476 U.S. at p. 94, fn. 18 [106 S.Ct. at pp. 1721-1722].) The court has since repeatedly cited title VII cases as authoritative in the *Batson* context. (*Miller-El v. Cockrell* (2003) 537 U.S. 322, 338 [123 S.Ct. 1029, 1041, 154 L.Ed.2d 931] (*Miller-El*); *Purkett v. Elem* (1995) 514 U.S. 765, 768 [115 S.Ct. 1769, 1771, 131 L.Ed.2d 834]; *Hernandez v. New York* (1991) 500 U.S. 352, 359 [111 S.Ct. 1859, 1866, 114 L.Ed.2d 395] (plur. opn.).) One of the decisions the court cited in *Batson, McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 [93 S.Ct. 1817, 36 L.Ed.2d 668], made clear that the plaintiff carried the initial burden of showing actions "from which one can infer, if such actions remain unexplained, that

*it is more likely than not* that such actions were 'based on a discriminatory criterion illegal under the Act.' " (*Furnco Construction Corp. v. Waters* (1978) 438 U.S. 567, 576 [98 S.Ct. 2943, 2949, 57 L.Ed.2d 957], italics added.) Another of the decisions that *Batson* cited explained that the burden is not "onerous," but the party nevertheless had to prove "by the *preponderance of the evidence* a prima facie case of discrimination." (*Texas Dept. of Community Affairs v. Burdine* (1981) 450 U.S. 248, 252-253 [101 S.Ct. 1089, 1093], italics added.) It stated that "the prima facie case 'raises an *inference* of discrimination only because we presume these acts, if otherwise unexplained, are *more likely than not* based on the consideration of impermissible factors.' " (*Id.* at p. 254 [101 S.Ct. at p. 1094], italics added.)

In one of the cases *Batson* cited, the high court recognized that the term "prima facie case" is, by itself, ambiguous, so it specifically stated what it meant in this context. "The phrase 'prima facie case' not only may denote the establishment of a legally mandatory, rebuttable presumption, but also may be used by courts to describe the plaintiff's burden of producing enough evidence to permit the trier of fact to infer the fact at issue. 9 J. Wigmore, Evidence § 2494 (3d ed. 1940). *McDonnell Douglas* should have made it apparent that in the Title VII context we use 'prima facie case' in the former sense." (*Texas Dept. of Community Affairs v. Burdine, supra,* 450 U.S. at p. 254, fn. 7 [101 S.Ct. at p. 1094].) Thus, when it refers to the objector establishing "an inference of discriminatory purpose" (*Batson, supra,* 476 U.S. at p. 94 [106 S.Ct. at p. 1721]), the high court means establishing a legally mandatory rebuttable presumption, and *not* merely presenting enough evidence to *permit the inference.*

Wigmore, in turn, goes into greater detail. He explains that the term " 'prima facie case' is used in two senses . . . ." (9 Wigmore, Evidence (Chadbourne rev. ed. 1981) § 2494, p. 378.)[2] The sense the high court does *not* mean in this context created the lower of the two burdens—merely the "duty of producing *some evidence*" sufficient to allow a matter to go to the jury. (Wigmore, at p. 379, italics added.) Wigmore also describes the sense in which the high court uses the term. "[T]he term 'prima facie' is sometimes used as *equivalent to the notion of a presumption,* even in the strict sense of a ruling of the judge putting upon the opponent the duty of producing evidence." (*Ibid.*) Thus, it applies "where the proponent, having the burden of proving the issue (i.e., the risk of nonpersuasion of the jury), has not only removed by sufficient evidence the duty of producing evidence to get past the judge or the jury, but has gone further, and, either by means

---

[2]We are quoting the most recent revision of this work rather than the earlier version the high court cited in *Texas Dept. of Community Affairs v. Burdine, supra,* 450 U.S. 248; the two versions are identical as relevant.

of a presumption or by a general mass of *strong evidence*, has entitled himself to a ruling that the opponent should fail if he does nothing more in the way of producing evidence." (*Ibid.*, italics added.)

Thus, *Batson* permits a court to require the objector to present, not merely "some evidence" permitting the inference, but "strong evidence" that makes discriminatory intent more likely than not if the challenges are not explained. Nothing suggests the high court has since modified *Batson*'s approach. Indeed, in its most recent decision on this subject, it said it was considering "the three-step framework mandated by *Batson* and reaffirmed in our later precedents" and, in describing the prima facie case requirement, echoed *Batson*'s "inference" language. (*Miller-El, supra,* 537 U.S. at pp. 338, 347 [123 S.Ct. at pp. 1040, 1045] ["the inference of discrimination to support a prima facie case"].)

Other states, although not all,[3] have reached similar conclusions regarding *Batson*'s meaning. Citing *Texas Dept. of Community Affairs v. Burdine, supra,* 450 U.S. at pages 252-253 [101 S.Ct. at page 1093], the Connecticut Supreme Court has said that under the first stage of the *Batson* inquiry, the "defendant must establish by a preponderance of the evidence a prima facie case of purposeful discrimination." (*State v. Gonzalez* (1988) 206 Conn. 391 [538 A.2d 210, 213].) The Maryland Court of Appeals recognized that *Batson* cited title VII cases "for an explanation of the operation of prima facie burden of proof rules." (*Stanley v. State* (1988) 313 Md. 50 [542 A.2d 1267, 1271].) The Maryland Court of Appeals also concluded that "to make the *prima facie* showing *Batson* requires, the moving party must 'prove by a preponderance of the evidence that the peremptory challenges were exercised in a way that shifts the burden of production to the State and requires it to respond to the rebuttable presumption of purposeful discrimination that arises under certain circumstances.' " (*Mejia v. State* (1992) 328 Md. 522 [616 A.2d 356, 361], quoting *Stanley v. State, supra,* at p. 1277.)

*Wheeler*'s term "strong likelihood" signals that it meant "prima facie case" in a similar sense.[4] This burden is not onerous (*Texas Dept. of Community Affairs v. Burdine, supra,* 450 U.S. at p. 253 [101 S.Ct. at pp. pp. 1093-1094]), but it is substantial. It is also appropriate to compel the objecting

[3]The Colorado Supreme Court, for example, has interpreted *Batson* as not requiring the defendant "to prove by a preponderance of the evidence that discrimination occurred. Rather, the defendant must present evidence sufficient to raise an inference that discrimination occurred." (*Valdez v. People* (Colo. 1998) 966 P.2d 587, 590.) But the court did not examine what the high court itself has stated on the question.

[4]The dissent claims Evidence Code section 600, subdivision (b), which defines an inference as "a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action," somehow supports its position. (Dis. opn., *post,* at p. 1334.) The *Wheeler* court certainly understood that an inference is a logical

party to meet this burden before it can force the other party to explain the reasons for its peremptory challenges. The burden is one "which a party may reasonably be expected to sustain in meritorious cases, but which he cannot abuse to the detriment of the peremptory challenge system." (*Wheeler, supra,* 22 Cal.3d at p. 278.) The high court itself has noted that the *Batson* analysis "permits prompt rulings on objections to peremptory challenges without substantial disruption of the jury selection process." (*Hernandez v. New York, supra,* 500 U.S. at p. 358 [111 S.Ct. at pp. 1865-1866] (plur. opn.); see also *id.* at p. 374 [111 S.Ct. at p. 1874] (conc. opn. of O'Connor, J.) [warning against "unacceptable delays in the trial process" that would be "antithetical to the nature and purpose of the peremptory challenge"].)

The term "strong likelihood" has never set a higher standard than *Batson* permits. *Wheeler* "define[d] a burden of proof . . . ." (*Wheeler, supra,* 22 Cal.3d at p. 278.) "Except as otherwise provided by law," the default burden of proof in California is "proof by a preponderance of the evidence." (Evid. Code, § 115; see *Conservatorship of Wendland* (2001) 26 Cal.4th 519, 546 [110 Cal.Rptr.2d 412, 28 P.3d 151].) Here, no other law has provided for a different standard. This court has never suggested that *Wheeler* imposed the burden of either clear and convincing proof or proof beyond a reasonable doubt, the two higher burdens of proof that exist in this state. (Evid. Code, § 115.) Moreover, the unqualified word "likelihood" would have been insufficient to signal the correct standard. That word, or the equivalent "likely," has a range of meanings, including some lower than more likely than not. (See *People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 917, 922 [119 Cal.Rptr.2d 1, 44 P.3d 949] [interpreting a statute using the word "likely" as not requiring a showing of a "better than even" chance].) Thus, qualifying "likelihood" with "strong" is appropriate and consistent with *Batson.*

Although not dispositive, the *Batson* court itself considered *Wheeler*'s procedures comparable to its own. It did not specifically cite *Wheeler*'s "strong likelihood" language, but it referred to this court's "procedures implementing its version of [*Batson*'s evidentiary] standard" without suggesting there was anything wrong with those procedures. (*Batson, supra,* 476 U.S. at p. 99, fn. 23 [106 S.Ct. at p. 1724].)

We disagree that the "strong likelihood" standard became too high in the interval between *People v. Bernard, supra,* 27 Cal.App.4th 458, and *People*

---

deduction of fact. But the question here, which Evidence Code section 600 does not address, is how strong the inference must be. In a criminal trial, for example, an inference of guilt must be beyond a reasonable doubt. The dissent's own unique proposed test—"a substantial danger that the prosecutor's challenges were based on improper grounds"—is not found in Evidence Code section 600. (Dis. opn., *post,* at p. 1334.)

*v. Box, supra*, 23 Cal.4th 1153. *Bernard* did not somehow transform "strong likelihood" from a correct to an incorrect standard. Like the court in *Wade v. Terhune, supra*, 202 F.3d 1190, and the majority below, the *Bernard* court did not examine what *Wheeler* or the high court meant by the word "inference" in this context. It misunderstood that meaning. The *Bernard* court said the presumption that peremptory challenges are being used properly should be rebuttable "only by a strong showing, not a mere inference," because a different standard "might easily transform removal of each and every prospective juror belonging to a cognizable group into a *Wheeler* hearing." (*People v. Bernard, supra*, at p. 465.) It also referred to "a reduction of the prima facie standard to a 'reasonable inference' test." (*Ibid.*) This use of the word "inference" was akin to Wigmore's lower sense of evidence merely permitting one to draw an inference, not the higher sense of *Batson* and *Wheeler*. Thus, to the extent *Bernard* erred, it was in assuming "inference" was lower than it really is in this context, not in raising "strong likelihood" to an impermissibly high standard.

Accordingly, *Wheeler*'s standard for establishing a prima facie case of discriminatory use of peremptory challenges is, and always has been, compatible with *Batson*. It merely means that to state a prima facie case, the objector must show that it is more likely than not the other party's peremptory challenges, if unexplained, were based on impermissible group bias. The trial court here properly cited the *Wheeler* standard in determining whether defendant had established a prima facie case.

C. *Appellate Use of Comparative Juror Analysis*

The majority below compared the answers of challenged jurors with those of nonchallenged jurors, a comparison not done at trial, in order to overturn the trial court's finding of no prima facie case. Defendant argues that doing so was proper and that our cases, which he interprets as prohibiting all comparative juror analysis, violate *Batson, supra*, 476 U.S. 79. Defendant misunderstands our jurisprudence. We have observed that engaging in comparative juror analysis *for the first time on appeal* is unreliable and inconsistent with the deference reviewing courts necessarily give to trial courts, but we have never prohibited trial courts from doing so or the party objecting to the challenges from relying on such analysis in seeking to make a prima facie case.

In *People v. Johnson, supra*, 47 Cal.3d 1194, we revisited *People v. Trevino* (1985) 39 Cal.3d 667 [217 Cal.Rptr. 652, 704 P.2d 719], which had engaged in comparative juror analysis for the first time on appeal. We found that *Trevino* had "placed undue emphasis on comparisons of the stated

reasons for the challenged excusals with similar characteristics of nonmembers of the group who were not challenged by the prosecutor. First, we note . . . that the comparison is one-sided since it ignores the characteristics of the other . . . jurors against whom the prosecutor also exercised peremptory challenges. [Citation.] Moreover, we fail to see how a trial judge can reasonably be expected to make such detailed comparisons mid-trial." (*People v. Johnson, supra*, at p. 1220.)

We explained that "use of a comparison analysis to evaluate the bona fides of the prosecutor's stated reasons for peremptory challenges does not properly take into account the variety of factors and considerations that go into a lawyer's decision to select certain jurors while challenging others that appear to be similar. Trial lawyers recognize that it is a combination of factors rather than any single one which often leads to the exercise of a peremptory challenge. In addition, the particular combination or mix of jurors which a lawyer seeks may, and often does, change as certain jurors are removed or seated in the jury box." (*People v. Johnson, supra*, 47 Cal.3d at p. 1220.)[5] We found it apparent "that the very dynamics of the jury selection process make it difficult, if not impossible, on a cold record, to evaluate or compare the peremptory challenge of one juror with the retention of another juror which on paper appears to be substantially similar. [Attempting] to make such an analysis of the prosecutor's use of his peremptory challenges is highly speculative and less reliable than the determination made by the trial judge who witnessed the process by which the defendant's jury was selected. It is therefore with good reason that we and the United States Supreme Court give great deference to the trial court's determination that the use of peremptory challenges was not for an improper or class bias purpose." (*Id.* at p. 1221.)

Accordingly, we disapproved *People v. Trevino, supra*, 39 Cal.3d 667, to the extent it was inconsistent with these views and returned to a "standard of truly giving great deference to the trial court in distinguishing bona fide reasons from sham excuses." (*People v. Johnson, supra*, 47 Cal.3d at p. 1221.) Like the high court, we stated we " 'may assume that trial judges, in supervising *voir dire* in light of our decision today, will be alert to identify a prima facie case of purposeful discrimination.' " (*Ibid.*, quoting *Batson, supra*, 476 U.S. at p. 99, fn. 22 [106 S.Ct. at p. 1724].)

Since then, we have not engaged in comparative juror analysis for the first time on appeal. ■ "If the trial court makes a 'sincere and reasoned

[5]This case presents an example. The district attorney accepted the jury four times with C.T. on it before he peremptorily challenged her, apparently due to a change in the jury's composition.

effort' to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. In such circumstances, an appellate court will not reassess good faith by conducting its own comparative juror analysis. Such an approach would undermine the trial court's credibility determinations and would discount ' "the variety of [subjective] factors and considerations," ' including 'prospective jurors' body language or manner of answering questions,' which legitimately inform a trial lawyer's decision to exercise peremptory challenges." (*People v. Montiel, supra,* 5 Cal.4th at p. 909.)

Defendant argues that *any* rule against comparative juror analysis is invalid but, as a backup position, he also argues that, at least, the rule is limited to the *second* stage of the trial court's duty—judging the validity of the reasons for the exercising of challenges after it has found a prima facie case—and does not apply to the *first* stage—judging whether the objector has established a prima facie case to begin with. We disagree. Although some of our decisions, including *People v. Johnson, supra,* 47 Cal.3d 1194, did involve the second stage, others reviewed trial court findings of no prima facie case. (E.g., *People v. Box, supra,* 23 Cal.4th at pp. 1188, 1190; *People v. Turner* (1994) 8 Cal.4th 137, 167, 169-170 [32 Cal.Rptr.2d 762, 878 P.2d 521].) Differences do exist in the two procedural postures. At the first stage, the party making the challenges is not asked to explain them, so the trial court does not have to judge that party's credibility. But the concerns about the inability of a reviewing court to judge the dynamics of jury selection *on a cold record* apply to both stages. A comparison of the jurors' answers is unreliable when divorced from the context of the trial. A trial court, but not a reviewing court, is able to place the answers into context and draw meaning from *all* the circumstances, including matters not discernable from the record.

Even the Ninth Circuit Court of Appeals, which has a different practice in this regard than we (*Burks v. Borg* (9th Cir. 1994) 27 F.3d 1424, 1427), reviews a trial court's finding of no prima facie case deferentially. (*Tolbert v. Page* (9th Cir. 1999) 182 F.3d 677 (in bank).) Its reasoning for giving such deference echoes ours both in giving similar deference and in not engaging in comparative juror analysis for the first time on appeal. "[T]he trial court is better positioned to decide the *Batson* prima facie issue, which involves a ' "factual inquiry" that "takes into account all the possible explanatory factors" in the particular case.' [Citation.] Whether or not 'all the relevant circumstances' 'raise an inference' of discrimination will depend on factors such as the attitude and behavior of the challenging attorney and the prospective jurors manifested during voir dire. As a purely practical matter, the trial judge's unique perspective of voir dire enables the judge to have

first-hand knowledge and observation of critical events. [Citation.] The trial judge personally witnesses the totality of circumstances that comprises the 'factual inquiry,' including the jurors' demeanor and tone of voice as they answer questions and counsel's demeanor and tone of voice in posing the questions. [Citation.] The trial judge is able to observe a juror's attention span, alertness, and interest in the proceedings and thus will have a sense of whether the prosecutor's challenge can be readily explained by a legitimate reason. . . . In addition, the trial court is 'experienced in supervising voir dire.' [Citations.]

"The appellate court, on the other hand, must judge the existence of a prima facie case from a cold record. An appellate court can read a transcript of the voir dire, but it is not privy to the unspoken atmosphere of the trial court—the nuance, demeanor, body language, expression and gestures of the various players. [Citation.] . . . [T]he prima facie inquiry is so fact-intensive and so dependent on first-hand observations made in open court that the trial court is better positioned to decide the issue . . . ." (*Tolbert v. Page, supra,* 182 F.3d at pp. 683-684.)

"While [*People v. Johnson, supra,* 47 Cal.3d 1194] limits the scope of appellate review of a trial court's *Batson* determination, it does not preclude comparative analysis by the trial court." (*Burks v. Borg, supra,* 27 F.3d at p. 1428.) We do not, and cannot reasonably, require trial judges to perform such analysis *itself* (*People v. Johnson, supra,* 47 Cal.3d at p. 1220), but the objecting party may make the argument for the trial court to evaluate. For example, in *People v. Crittenden* (1994) 9 Cal.4th 83 [36 Cal.Rptr.2d 474, 885 P.2d 887], the defendant presented at trial "evidence, compiled from the biographical information of 50 prospective jurors," and compared those jurors' answers in support of his argument that the prosecutor improperly challenged a particular juror. (*Id.* at p. 116.) As the reviewing court, we considered this and other evidence and concluded that "[i]n light of all the relevant circumstances, the trial court properly could find that defendant had not made a prima facie showing . . . ." (*Id.* at p. 119.)

In support of his position, defendant cites *Miller-El, supra,* 537 U.S. 322 [123 S.Ct. 1029], but that case merely provides another example of a reviewing court considering evidence of comparative juror analysis after it had been presented to the trial court. *Miller-El* was tried before the decision in *Batson, supra,* 476 U.S. 79. At trial, the defendant had objected that the prosecution was using peremptory challenges discriminatorily, but the *Batson* procedures had not yet been established. *Batson* was decided while the case was on appeal. The Texas Court of Criminal Appeals remanded the case to the original trial court for new findings in light of *Batson*. Defendant

presented to the trial court several types of evidence supporting a prima facie case. Before the original trial, he had presented "evidence relating to a pattern and practice of race discrimination in the *voir dire*." (*Miller-El, supra,* 537 U.S. at p. 331 [123 S.Ct. at p. 1036].) Then, two years later, "he presented, to the same state [trial] court, evidence that directly related to the conduct of the prosecutors in his case." (*Ibid.*) Some of the latter evidence was comparative juror analysis of the type offered for the first time on appeal here. (*Id.* at p. 343 [123 S.Ct. at p. 1043].) After the state courts denied relief, the federal district court denied relief on federal habeas corpus, and the appellate court denied a certificate of appealability which, under federal law, prevented the defendant from appealing the matter. The United States Supreme Court reversed the denial of a certificate of appealability. It did not directly address the *Batson* question, but rather determined that the issue was "debatable" and, under federal habeas corpus law, the appellate court should have considered it on the merits. (*Id.* at p. 348 [123 S.Ct. at p. 1045].) Its discussion made clear that the comparative juror analysis presented to the trial court was among the evidence reviewing courts should consider. (*Id.* at p. 343 [123 S.Ct. at p. 1043].) This conclusion is consistent with our practice. Nothing in *Miller-El,* however, suggests that a reviewing court must engage in comparative juror analysis *for the first time on appeal.*

Both *Wheeler* and *Batson* place the burden of making the prima facie showing on the objecting party. (*Batson, supra,* 476 U.S. at p. 96 ["the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race"]; *Wheeler, supra,* 22 Cal.3d at p. 280 [the objecting party must "make a prima facie case of . . . discrimination to the satisfaction of the court," should "make as complete a record of the circumstances as is feasible," and "from all the circumstances of the case . . . must show a strong likelihood" of improper challenges].) Neither decision requires a reviewing court to search the record itself for evidence that might have supplemented the objector's showing. Nor must the trial court consider arguments not made and evidence not presented, although nothing prevents it from doing so in judging all of the circumstances.

Defendant argues that our statement that we cannot expect a trial judge "to make such detailed comparisons mid-trial" (*People v. Johnson, supra,* 47 Cal.3d at p. 1220) "overlooks the trial lawyers' role." He argues that the attorneys can make these arguments to assist the trial court "because, under the adversary system, the job of marshaling the relevant evidence is performed in the first instance by the lawyers. Accordingly, comparative juror analysis can easily and realistically be employed by state trial judges, too." We agree. Indeed, as noted, *People v. Crittenden, supra,* 9 Cal.4th 83,

provides an example of the attorneys doing just this for the trial court's consideration. But defendant did not make this kind of showing at trial, and we cannot expect the trial court to do so itself.

We have also said that comparative juror analysis is "largely beside the point" because of the legitimate subjective concerns that go into selecting a jury. (*People v. Arias* (1996) 13 Cal.4th 92, 136, fn. 16 [51 Cal.Rptr.2d 770, 913 P.2d 980].) But it is not *irrelevant*. Although such analysis, by itself, proves little, properly presented to the trial court, it can be among the "all relevant circumstances" (*Batson, supra*, 476 U.S. at pp. 96-97 [106 S.Ct. at p. 1723]) or "all the circumstances of the case" (*Wheeler, supra*, 22 Cal.3d at p. 280) that the trial court must consider in making its determination.

In *People v. Howard* (1992) 1 Cal.4th 1132 [5 Cal.Rptr.2d 268, 824 P.2d 1315], we did not "limit[] our review . . . solely to counsel's presentation at the time of the motion. This is because other circumstances might support the finding of a prima facie case even though a defendant's showing [was itself inadequate]. Nor should the trial court blind itself to everything except defense counsel's presentation. Indeed, we have emphasized that such rulings require trial judges to consider 'all the circumstances of the case' [citation] and call upon judges' ' "powers of observation, their understanding of trial techniques, and their broad judicial experience." ' [Citations.] The trial judge in this case, for example, obviously knew that defendant belonged to the same group as the challenged jurors and that his victims did not. Clearly these are relevant factors [citation], and they were apparent to the trial court even though defendant did not mention them during his *Wheeler* motion." (*Id.* at p. 1155.) "For these reasons," we said, "when a trial court denies a *Wheeler* motion without finding a prima facie case of group bias the reviewing court considers the entire record of voir dire." (*Ibid.*) Certainly, the trial court should consider obvious matters, and it can consider any other circumstances it finds relevant in the particular case. But, midtrial, we cannot expect, and do not demand, trial courts to engage sua sponte in the sort of comparative juror analysis that appellate lawyers and courts can do after scouring the often lengthy appellate record during the appeal. And, given the inability of reviewing courts to reliably conduct such analysis on a cold record, those courts are not required to do so for the first time on appeal.

Defendant cites a number of federal cases that engage in comparative juror analysis in a different way than we do. The Ninth Circuit, for example, has stated that its practice is different than ours. (*Burks v. Borg, supra*, 27

F.3d at p. 1427.)[6] Other courts may certainly adopt different procedures than we. But we do not believe that comparative juror analysis for the first time on appeal is constitutionally compelled. The *Batson* court itself stated that in deciding whether the defendant has made the necessary showing, "the *trial court* should consider all relevant circumstances." (*Batson, supra,* 476 U.S. at pp. 96-97 [106 S.Ct. at p. 1723], italics added.) It relies heavily on "trial judges, experienced in supervising *voir dire,*" to make this determination. (*Id.* at p. 97 [106 S.Ct. at p. 1723].) "During jury selection, the entire *res gestae* take place in front of the trial judge. Because the judge has before him the entire venire, he is well situated to detect whether a challenge to the seating of one juror is part of a 'pattern' of singling out members of a single race for peremptory challenges." (*United States v. Armstrong* (1996) 517 U.S. 456, 467-468 [116 S.Ct. 1480, 1488, 134 L.Ed.2d 687].) The "entire *res gestae*" do not take place in front of an appellate court.

The *Batson* court rejected the argument that its holding would "create serious administrative difficulties" and noted that California had not found its own version to be "burdensome for trial judges." (*Batson, supra,* 476 U.S. at p. 99 & fn. 23 [106 S.Ct. at p. 1724], citing *People v. Hall* (1983) 35 Cal.3d 161 [197 Cal.Rptr. 71, 672 P.2d 854].) However, requiring trial courts to engage in comparative juror analysis sua sponte in the middle of the trial *would* be burdensome. Moreover, permitting appellate courts to overturn trial court decisions based on their own comparative analysis of a cold record, divorced from the nuances of trial not apparent from the record, is inconsistent with the deference reviewing courts necessarily give trial courts. We see nothing in the high court decisions requiring us to defer less to trial courts or engage in our own comparative juror analysis for the first time on appeal.[7]

█ Accordingly, we maintain our long-standing practice. When the objecting party presents comparative juror analysis to the trial court, the

---

[6] That court also noted that the United States Supreme Court "has not yet ruled on the role of comparative analysis on appellate review, so no one is quite sure whether our circuit or the California Supreme Court is right." (*Burks v. Borg, supra,* 27 F.3d at p. 1427.)

[7] The dissent claims that our reliance on *People v. Johnson, supra,* 47 Cal.3d 1194, is misplaced because *Johnson* barred using comparative juror analysis on appeal *whether or not the parties raised that approach in the trial court.* (Dis. opn., *post,* at pp. 1330-1332.) Contrary to the dissent, *Johnson's* underlying rationale was predicated on the fact that the defendant made no comparative juror argument *at trial.* We reasoned that (1) a trial judge could not reasonably be expected to make detailed comparisons of jurors midtrial *sua sponte,* and (2) *without explanation at trial* from the party who exercised the challenge, comparative juror analysis could not accurately take into account the various factors that influence the decision to make a peremptory challenge. (*Johnson, supra,* at pp. 1220-1221.) We then concluded, "It should be apparent, *therefore,* that the very dynamics of the jury selection process make it difficult, if not impossible, *on a cold record,* to evaluate or compare the peremptory challenge of one juror with the retention of another juror which *on paper* appears to be substantially similar." (*Id.* at p. 1221, italics added.) In other words, the trial and appellate courts are in no

reviewing court must consider that evidence, along with everything else of relevance, in reviewing, deferentially, the trial court's ruling. When such an analysis was not presented at trial, a reviewing court should not attempt its own comparative juror analysis for the first time on appeal, especially when, as here, the record supports the trial court's finding of no prima facie case. While we decline to prohibit the practice outright, we are hard pressed to envision a scenario where comparative juror analysis for the first time on appeal would be fruitful or appropriate.

### D. *The Trial Court's Ruling in This Case*

We have already alluded to the standard of appellate review of a trial court's finding of no prima facie case. Because these rulings call upon trial judges' personal observations, we review them with considerable deference. (*People v. Jones* (1998) 17 Cal.4th 279, 294 [70 Cal.Rptr.2d 793, 949 P.2d 890].) Of course, "deference is not abdication . . . ." (*People v. Scott* (1997) 15 Cal.4th 1188, 1212 [65 Cal.Rptr.2d 240, 939 P.2d 354]; see also *Miller-El, supra,* 537 U.S. at p. 340 [123 S.Ct. at p. 1041] ["deference does not imply abandonment or abdication of judicial review"].) Accordingly, we review the entire record for evidence supporting the trial court's ruling. But if the record suggests grounds on which the prosecutor might reasonably have challenged the jurors, we affirm that ruling. (*People v. Howard, supra,* 1 Cal.4th at p. 1155.)

■ The record here suggests grounds for the prosecutor to have reasonably challenged these jurors. The trial judge, "who had performed much of and observed the remainder of the voir dire, [and thus] was in the best position to determine under 'all the relevant circumstances' of the case" whether a prima facie showing existed (*People v. Box, supra,* 23 Cal.4th at p. 1189), mentioned reasons as to two of the jurors. The court noted that these reasons did not warrant a challenge for cause, but peremptory challenges need not be based on grounds for a challenge for cause. (*People v. Jones, supra,* 17 Cal.4th at p. 294.) So far as we can review the court's reasons on

position to engage in comparative juror analysis on their own, without the issue first being raised by the parties at trial. Our approach is entirely consistent with *Johnson.*

Contrary to the dissent, *People v. Johnson, supra,* 47 Cal.3d 1194, is also entirely consistent with *Miller-El.* In that case, the high court had "no difficulty in using comparative juror analysis" (dis. opn., *post,* at p. 1332) because it was simply reviewing the state court record, i.e., comparative juror evidence that the defendant had first presented to the trial judge in support of his *Batson* motion. (*Miller-El, supra,* 537 U.S. at pp. 328, 344-347 [123 S.Ct. at pp. 1035-1036, 1043-1045].) Evidently, none of the parties disputed that a comparative juror analysis is a proper or necessary procedure in deciding a *Batson* claim. Thus, that issue was not before the high court, which only addressed whether the underlying evidence before the state trial court supported the issuance of a certificate of appealability. (*Id.* at pp. 341-347 [123 S.Ct. at pp. 1042-1045].)

the cold record, the record supports them. Defendant has a different view of the significance of these jurors' answers and courtroom statements, but we see no basis on which to overturn the trial court's determinations.

As the majority below and defendant point out, the trial court did not specifically discuss the third of the challenged jurors, C.T., who was actually the first one challenged. But at trial, defendant did not argue that no reason existed to challenge that juror. His first *Wheeler* motion was "specifically" directed towards the challenge of S.E. His second *Wheeler* motion also never referred to C.T. The court acted reasonably in discussing the arguments defendant made, not arguments he did not make. Moreover, as the dissent below noted, the record discloses race-neutral grounds for challenging C.T.: "(1) she was childless (this case involved the death and alleged abuse of a minor), (2) the police had made no arrest after the robbery of her home five or six years ago, and (3) she omitted to answer the two questions in the questionnaire dealing with her opinions of prosecuting and defending attorneys." (Fn. omitted.) As that dissent also noted, " 'lack of family may have appeared relevant to the prosecutor in a case involving child abuse and reasonably could be deemed to constitute a non-discriminatory basis for striking the venireman.' " (Quoting *U.S. v. Lewis* (9th Cir. 1988) 837 F.2d 415, 417.)

Defendant stresses that the district attorney used three of his 12 peremptory challenges to remove all three African-American prospective jurors, and this case involves an African-American defendant charged with killing "his White girlfriend's child." These circumstances are obviously highly relevant to whether a prima facie case existed. (*Wheeler, supra,* 22 Cal.3d at pp. 280-281.) They definitely warranted the trial court's careful scrutiny, which that court gave. The court considered the question close but found no prima facie case under all the circumstances. We will not second-guess its determination by attempting a comparative juror analysis for the first time on appeal.

An additional note about the circumstances of this case is in order. Viewing these circumstances in isolation, it certainly looks suspicious that all three African-American prospective jurors were removed from the jury. But viewing a case like this in isolation is all a reviewing court *can* do. When this issue comes before a reviewing court, the circumstances often will be akin to those here. A reviewing court does not review the ordinary, nonsuspicious cases of jury selection. (Nor does it review those cases in which the trial court *grants* a *Wheeler* motion, so it also never sees those rulings.) A reviewing court does not see the big picture; it cannot place a case like this into perspective. It cannot know whether a case like this is typical, thus suggesting a real problem, or merely a statistical aberration of

the type that will inevitably occur occasionally given such a small sampling. The trial court, however, is capable of seeing the big picture. It can place a specific trial in a county into perspective. Trial judges " 'are in a good position to make such determinations . . . on the basis of their knowledge of local conditions and of local prosecutors.' " (*Wheeler, supra*, 22 Cal.3d at p. 281.) This is another reason we must, and can, rely on trial courts to determine, from all the relevant circumstances, whether a prima facie case of discriminatory use of peremptory challenges exists.

Defendant cites *Miller-El, supra*, 537 U.S. 322 [123 S.Ct. 1029], in support of his argument that a prima facie case existed here. In *Miller-El*, the prosecution conceded in the high court that the defendant had established a prima facie case. (*Id.* at p. 338 [123 S.Ct. at p. 1040].) But the evidence the defendant presented in that case was far stronger than here. The defendant there presented several types of evidence to the original trial court: (1) the statistical disparity of peremptory challenges of African-Americans (10 of 11 were challenged) compared to others (four of 31 were challenged); (2) a comparison of the manner in which the prosecution questioned African-Americans and others, which suggested "that the manner in which members of the venire were questioned varied by race" (*id.* at p. 332 [123 S.Ct. at p. 1037]); (3) a comparison of the answers of prospective jurors akin to the comparative juror analysis defendant attempts here to present for the first time on appeal (*id.* at p. 344 [123 S.Ct. at p. 1043]); (4) the prosecution's use of a procedural practice unknown in California called "jury shuffling," which can be used to manipulate which prospective jurors are actually called;[8] and (5) evidence that the district attorney's office historically had a pattern and practice of racial discrimination in voir dire.

Here, defendant's showing in the trial court consisted primarily of the statistical disparity of peremptory challenges between African-Americans and others. Regarding this type of evidence, *Miller-El* stated that "the statistical evidence alone raises some debate as to whether the prosecution acted with a race-based reason when striking prospective jurors. The prosecutors used their peremptory strikes to exclude 91% of the eligible African-American venire members, and only one served on petitioner's jury. In total, 10 of the prosecutors' 14 peremptory strikes were used against African-Americans. Happenstance is unlikely to produce this disparity." (*Miller-El, supra*, 537 U.S. at p. 342 [123 S.Ct. at p. 1042].) Here, the number of strikes is smaller, and thus perhaps more explainable by happenstance: three of the

---

[8]"On at least two occasions the prosecution requested shuffles when there were a predominate number of African-Americans in the front of the panel," with the result that the African-Americans were spread out more randomly and thus less likely to be called. (*Miller-El, supra*, 537 U.S. at p. 334 [123 S.Ct. at p. 1038].)

prosecutors' 12 peremptory strikes were used against African-Americans. In one respect, however, the percentages are even worse: the prosecutor challenged all three (100 percent) of the eligible African-Americans. But the high court did not cite the statistical evidence to show that it alone necessarily established a prima facie case, but only to support the overall conclusion that the merits of the habeas corpus petition were sufficiently debatable that the federal appellate court should have permitted an appeal. Here, both the trial court and this court have considered the issue on the merits. The statistics here are indeed troubling and, as the trial court stated, the question was close, but, for the reasons explained, we see no basis to overturn the trial court's carefully considered ruling.

 Defendant and the dissent (dis. opn., *post*, at p. 1340) also argue that the district attorney asked no questions of the African-American jurors he challenged. This circumstance may also be relevant. (*Wheeler, supra*, 22 Cal.3d at p. 281.) But this trial occurred in 1998, at a time the trial court had primary responsibility for conducting voir dire. (Code Civ. Proc., former § 223, as added by Prop. 115, approved by voters at Prim. Elec., June 5, 1990.) The district attorney asked no questions of any prospective juror, including the nine of other ethnic groups he also challenged. Thus, asking no questions was of little or no significance here.

### III. Conclusion

California's reviewing courts are as ready as any to combat the pernicious effects of racial and other improper discrimination, in jury selection as in other matters. (E.g., *People v. Silva* (2001) 25 Cal.4th 345, 386 [106 Cal.Rptr.2d 93, 21 P.3d 769] [reversing a sentence of death because of error as to a single prospective juror].) But, like the United States Supreme Court, we necessarily, yet confidently, rely primarily on the good judgment of our trial courts to make the difficult determinations the procedures established in *Batson, supra*, 476 U.S. 79, and *Wheeler, supra*, 22 Cal.3d 258, require. The record in this case provides no reason to believe the trial court here failed to perform its duty properly.

Accordingly, we reverse the judgment of the Court of Appeal and remand the matter for further proceedings consistent with our opinion.

George, C. J., Baxter, J., Brown, J., and Moreno, J., concurred.

**WERDEGAR, J.,** Concurring and Dissenting.—I concur in parts I., II.A. and II.C. of the majority opinion. With respect to the proper standard of proof for establishing a prima facie showing under *People v. Wheeler* (1978)

22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] and *Batson v. Kentucky* (1986) 476 U.S. 79 [106 S.Ct. 1712, 90 L.Ed.2d 69], I dissent and join part II. of Justice Kennard's dissenting opinion.

**KENNARD, J.,** Dissenting.—A peremptory challenge is presumed to have been based on valid grounds. If a defendant seeks to rebut this presumption, claiming that a prosecutor is improperly using peremptory challenges to remove prospective jurors solely because of group bias, the defendant must first establish a prima facie showing of discriminatory use.[1] (*Batson v. Kentucky* (1986) 476 U.S. 79 [106 S.Ct. 1712, 90 L.Ed.2d 69] (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*).) If the trial court finds that a prima facie case has been established, it will ask the prosecutor to explain the basis for the peremptory challenges. If, after hearing the explanations, "the court finds that the burden of justification is not sustained as to any of the questioned peremptory challenges, the presumption of their validity is rebutted . . . and it must dismiss the jurors thus far selected." (*Wheeler, supra,* at p. 282.)

This case presents two issues concerning motions based on *Wheeler* and *Batson* objecting to prosecutorial peremptory challenges: (1) Should this court use comparative juror analysis—comparing the challenged jurors with others who were not challenged—in reviewing the trial court decision that defendant had failed to establish a prima facie showing that the prosecutor's challenges had a discriminatory purpose? (2) What must a defendant prove to make that initial prima facie showing of discriminatory purpose? On the first question, the majority relies on *People v. Johnson* (1989) 47 Cal.3d 1194 [255 Cal.Rptr. 569, 767 P.2d 1047], to hold that an appellate court ordinarily should not use comparative juror analysis in reviewing a trial court's denial of a *Wheeler-Batson* motion if the defendant has not raised that analysis in the trial court. I agree with that result, but would reach it by a different route. On the second question, the majority upholds the trial court's ruling finding no prima facie case on the ground that defendant failed to show that it is more likely than not that the peremptory challenges had a discriminatory purpose. I disagree with this standard, and would hold that a defendant need only prove facts that, if unexplained, permit a reasonable inference of discriminatory purpose. Even without using comparative juror analysis, the record here shows that defendant met that standard.

[1] I speak of a prosecutor's use of peremptory challenges and a defendant's objection because this case, like both *Wheeler* and *Batson*, arose in that factual setting. The principles of those decisions, however, also apply to peremptory challenges by a criminal defendant (*Georgia v. McCollum* (1992) 505 U.S. 42 [112 S.Ct. 2348, 120 L.Ed.2d 33]) and to challenges by parties to civil cases (*Edmonson v. Leesville Concrete Co., Inc.* (1991) 500 U.S. 614 [111 S.Ct. 2077, 114 L.Ed.2d 660]).

I

Comparative juror analysis involves comparing the challenged jurors to jurors who were not challenged to determine whether a proffered reason for a challenge is genuine or pretextual. For example, if the prosecution says it challenged juror A for not having a high school education, it would be of interest whether the prosecution challenged jurors B and C who also lack that education. If the prosecutor did, that would suggest that the proffered ground for challenge was genuine; if not, it would suggest there was probably some other reason for the challenge to juror A. Here, the trial court found defendant had not established a prima facie showing that the prosecutor's challenges had a discriminatory purpose because, in the court's view, the record showed neutral reasons why the prosecutor might have challenged the jurors in question. The defense could have used comparative juror analysis to question those reasons, but it did not do so. By failing to use comparative juror analysis in the trial court, the defense not only deprived the prosecution of the opportunity to explain the pattern of its preemptive challenges to the trial court, but it also deprived the trial court of the opportunity to evaluate that explanation in the context of the voir dire the court observed.

It is well settled that ordinarily an appellate court will not consider a theory not raised at trial. (See generally 1 Appeals & Writs in Criminal Cases (Cont.Ed.Bar 2d ed. 2000) § 1.165, pp. 164.2-165, and cases there cited; Erwin et al., Cal.. Criminal Defense Practice (2002) § 101.35, pp. 108-112, and cases there cited.) "The general rule confining the parties on appeal to the theory advanced below is based on the rationale that the opposing party should not be required to defend for the first time on appeal against a new theory that 'contemplates a factual situation the consequences of which are open to controversy and were not put in issue or presented at the trial.' [Citation.]" (*Ward v. Taggart* (1959) 51 Cal.2d 736, 742 [336 P.2d 534].) There are many examples. (See, e.g., *People v. Carrera* (1989) 49 Cal.3d 291, 324 [261 Cal.Rptr. 348, 777 P.2d 121] [appellant cannot raise new ground for claiming evidence was inadmissible]; *People v. Raley* (1992) 2 Cal.4th 870, 898 [8 Cal.Rptr.2d 678, 830 P.2d 712] [constitutional contention cannot be raised on appeal when issue was argued only on statutory grounds in the trial court].) Because defendant here failed to use comparative jury analysis in the trial court, this rule precludes defendant from arguing that theory on appeal.

The majority reaches the same conclusion, but instead of basing that conclusion on well-settled principles of appellate review, it relies on a

special California rule barring appellate courts from undertaking comparative juror analysis. This rule derives from *People v. Johnson, supra,* 47 Cal.3d 1194 (*Johnson*). Although the recitation of facts in *Johnson* suggests that the defendant did not use a comparative juror analysis in arguing his *Wheeler* motion at trial, the reasoning of this court did not rest on that fact. Instead, the *Johnson* majority gave three reasons for eschewing use of comparative juror analysis: (1) that a trial judge could not reasonably be expected to make detailed comparisons of jurors midtrial; (2) that comparative juror analysis does not properly take into account the variety of factors and considerations that influence the decision whom to challenge; and (3) that a comparative juror analysis by an appellate court on a cold record is less reliable than the decision of the trial court, which can observe the jurors and appreciate the setting of the challenges. (*Id.* at pp. 1220-1221.)

Because those reasons apply whether or not the defendant argues comparative juror analysis in the trial court, the more reasonable reading of *Johnson* is that it barred the use of comparative juror analysis on appeal whether or not that approach was urged before the trial court. Later decisions of this court followed *Johnson* and without exception rejected comparative juror analysis. None says that the reason for not engaging in comparative juror analysis was that the defendant did not raise the matter at trial; many do not even indicate whether the defendant urged comparative juror analysis in support of the motion in the trial court. (See, e.g., *People v. Catlin* (2001) 26 Cal.4th 81, 119, fn. 5 [109 Cal.Rptr.2d 31, 26 P.3d 357]; *People v. Ayala* (2000) 24 Cal.4th 243, 270 [99 Cal.Rptr.2d 532, 6 P.3d 193]; *People v. Jones* (1998) 17 Cal.4th 279, 295 [70 Cal.Rptr.2d 793, 949 P.2d 890]; *People v. Turner* (1994) 8 Cal.4th 137, 164 [32 Cal.Rptr.2d 762, 878 P.2d 521].)[2] In *People v. Montiel* (1993) 5 Cal.4th 877, 911 [21 Cal.Rptr.2d 705, 855 P.2d 1277], this court refused to use comparative juror analysis on appeal, even though the prosecutor had used that analytic technique at trial to justify his peremptory challenges.

But a unique California rule barring comparative juror analysis on appeal, even if that technique were used in the trial court, would be constitutionally suspect under the recent United States Supreme Court decision in *Miller-El*

---

[2]*People v. Crittenden* (1994) 9 Cal.4th 83 [36 Cal.Rptr.2d 474, 885 P.2d 887] is not necessarily an exception to this pattern. The defendant there did raise comparative juror analysis at trial. On appeal, this court did not review the defendant's analysis and compare individual jurors, but said that the analysis was inapplicable because the defendant was comparing the challenged Black jurors to other jurors who had also been removed by peremptory challenge.

*v. Cockrell* (2003) 537 U.S. 322 [123 S.Ct. 1029, 154 L.Ed.2d 931] (*Miller-El*).[3] In *Miller-El,* the question before the Supreme Court was whether the defendant's *Batson* claim was an appealable issue under 28 United States Code section 2253(c)(2), which requires that the appellant demonstrate "a substantial showing of the denial of a constitutional right." The majority used comparative juror analysis to conclude that the defendant should have been given a certificate of appeal. (*Miller-El, supra,* 537 U.S. at p. 342 [123 S.Ct. at pp. 1042-1043].) Justice Scalia, concurring, also applied comparative juror analysis. (537 U.S. at p. 352 [123 S.Ct. at pp. 1047-1048] (conc. opn. of Scalia, J.).) In dissenting, Justice Thomas disagreed with conclusions of the majority's comparative juror analysis, but not with the appropriateness of the technique. (537 U.S. at p. 362 [123 S.Ct. at p. 1053] (dis. opn. of Thomas, J.).)

The United States Supreme Court ruling in *Miller-El, supra,* 537 U.S. 322 [123 S.Ct. 1029], was made on what could be termed a "chilly," if not a "cold," record. When the jury was selected, the defendant objected to its composition but did *not* use comparative juror analysis. Two years later, after the high court's intervening decision in *Batson, supra,* 476 U.S. 79, the case was remanded to the trial court. The original prospective jurors were not present, and it is open to question how much the trial court could recall of the demeanor and body language of prospective jurors or the circumstances of the challenges. The trial court's ruling on remand was based on a cold record—the written questionnaires and the transcript of the voir dire—plus new testimony offered by the prosecutors to explain their challenges. Yet the United States Supreme Court noted no difficulty in using comparative juror analysis under those circumstances. The unhesitating use of comparative juror analysis by all Supreme Court justices in *Miller-El* is a striking contrast to the language of *People v. Arias* (1996) 13 Cal.4th 92, 136, footnote 16 [51 Cal.Rptr.2d 770, 913 P.2d 980], where this court declared that comparative juror "analysis is largely beside the point, because it ignores the legitimate subjective concerns 'that go into a lawyer's decision to select certain jurors while challenging others that appear to be similar [on the cold record].' " *Miller-El* shows that comparative juror analysis is very much on point when the trial court or the appellate court analyzes the prosecution's explanations for its peremptory challenges. Although the majority here reinterprets *Johnson, supra,* 47 Cal.3d 1194, to permit appellate consideration of comparative juror analysis when that issue was raised at

[3] I was not yet on the court in February of 1989 when it decided *Johnson, supra,* 47 Cal.3d 1194, but I followed that precedent and concurred in post-*Johnson* decisions rejecting comparative juror analysis. The United States Supreme Court's 2003 decision in *Miller-El, supra,* 537 U.S. 322 [123 S.Ct. 1029], has led me to reconsider the basis for this court's rejection of comparative juror analysis on appeal.

trial, it does not repudiate language from *Johnson, Arias,* at page 136, and other cases denigrating that technique—language which is not in harmony with the United States Supreme Court opinions in *Miller-El.*

The rules of appellate review are clear and simple: With certain exceptions, none applicable here, a party cannot raise on appeal an issue the party neglected to raise at trial. There is no reason to go beyond those rules to perpetuate a separate doctrine that bars a party from raising comparative juror analysis on appeal when it has not been raised at trial.

## II

In *Wheeler, supra,* 22 Cal.3d 258, we used two different phrases to describe the standard for a prima facie case. We first said that the moving party "must show a *strong likelihood* that such persons are being challenged because of their group association rather than because of any specific bias." (*Id.* at p. 280, italics added.) We also said, however, that upon the presentation of the moving party's evidence, "the court must determine whether a *reasonable inference* arises that peremptory challenges are being used on the ground of group bias alone." (*Id.* at p. 281, italics added.) Later cases have debated whether these two phrases state the same standard or two different standards. (Compare *People v. Box* (2000) 23 Cal.4th 1153, 1188 [99 Cal.Rptr.2d 69, 5 P.3d 130] [same standard] with *Cooperwood v. Cambra* (9th Cir. 2001) 245 F.3d 1042, 1047, and *Wade v. Terhune* (9th Cir. 2000) 202 F.3d 1190, 1196-1197 [two different standards].)

The majority here reaffirms *People v. Box, supra,* 23 Cal.4th 1153, and holds that *Wheeler*'s "strong likelihood" and "reasonable inference" language states the same standard. But it then goes beyond *Box* to describe the standard as requiring a defendant seeking to establish a prima facie case to persuade the trial court that it is more likely than not that the prosecution's challenges had a discriminatory purpose. The correct standard, however, is that the defendant must present facts that support a reasonable *inference* of discriminatory purpose. The distinction is subtle but crucial. A defendant will often be able to present facts, such as a pattern of prosecution challenges, from which a reasonable person can infer discriminatory purpose, but it is only at the next stage, when the prosecutor explains or fails to explain the challenges, that the trial court can determine whether the challenges actually were improper. Requiring a defendant to persuade the trial court of the prosecutor's discriminatory purpose at the first *Wheeler-Batson* stage short-circuits the process, and provides inadequate protection for the defendant's right to a fair trial under the equal protection clause of the federal Constitution (*Batson, supra,* 476 U.S. at pp. 84-89 [106 S.Ct. at pp. 1718-1719]) and his right to a representative jury under the state Constitution (*Wheeler, supra,* 22 Cal.3d at pp. 276-277).

*Wheeler,* as I noted, used two terms—"reasonable inference" and "strong likelihood"—to define a party's initial burden. "Inference" is defined by statute; it is "a deduction of a fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action." (Evid. Code, § 600.) It is presumed that the Legislature, when it enacts a law that uses a term defined in another statute, is aware of the statutory definition. (*Colmenares v. Braemer Country Club, Inc.* (2003) 29 Cal.4th 1019, 1030 [130 Cal.Rptr.2d 662, 63 P.3d 220]; *People v. Broussard* (1993) 5 Cal.4th 1067, 1080 [22 Cal.Rptr.2d 278, 856 P.2d 1134].) By the same reasoning, it should be presumed that the *Wheeler* court was cognizant of the statutory definition of "inference" when it used that term to describe the standard of proof of a prima facie case. California cases elucidate this definition: an inference "is more than a surmise or a conjecture" (*Aguimatang v. California State Lottery* (1991) 234 Cal.App.3d 769, 800 [286 Cal.Rptr. 57]) and must be based on probabilities, not possibilities (*ibid.*); "it is a reasonable deduction from the facts proved and, of course, must be logical" (*Estate of Braycovich* (1957) 153 Cal.App.2d 505, 512 [314 P.2d 767]). An inference, however, is permissive, and often a single set of facts can support multiple, conflicting inferences. (See *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 337 [100 Cal.Rptr.2d 352, 8 P.3d 1089] ["If such evidence logically permits conflicting inferences . . ."]; *People v. Cooper* (1991) 53 Cal.3d 771, 809 [281 Cal.Rptr. 90, 809 P.2d 865] ["if the prospective juror's responses are equivocal, i.e., capable of multiple inferences . . ."]; *Pasadena Unified Sch. Dist. v. Commission on Professional Competence* (1977) 20 Cal.3d 309, 314 [142 Cal.Rptr. 439, 572 P.2d 53] ["When more than one inference can be reasonably deduced from the facts . . ."].)

"Likelihood," on the other hand, has no statutory definition. In *People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888 [119 Cal.Rptr.2d 1, 44 P.3d 949], this court said it did not necessarily mean "more likely than not." (*Id.* at p. 916.) We then construed that term to describe a standard less demanding than preponderance of the evidence, holding that, consistent with the purpose of the Sexually Violent Predators Act (Welf. & Inst. Code, § 6600 et seq.), a sexual offender should be considered to be "likely" to reoffend "if he or she presents a substantial danger—that is, a serious and well-founded risk—of reoffending." (*Ghilotti, supra,* 27 Cal.4th at p. 916, italics omitted.)

If we merge the two concepts—reasonable inference and strong likelihood—we emerge with the conclusion that the defendant must show facts from which one could logically deduce that there was a substantial danger that the prosecutor's challenges were based on improper grounds. Such a test is less demanding than the majority's requirement of persuading the trial court that discriminatory purpose is more likely than not.

Although past California cases have referred to both the "reasonable inference" and "strong likelihood" standards, none required the defendant to persuade the trial court, at the first stage of a *Wheeler-Batson* proceeding, that the challenges more likely than not had a discriminatory purpose. The vast majority of decisions from other jurisdictions permit the defendant to establish a prima facie case by raising a reasonable inference of discriminatory purpose; they do not require the defendant to persuade the trial court that discriminatory intent is more likely than not.[4] The majority here cites only two decisions from other states as supporting the standard it adopts. Both offer only weak and uncertain support.

The majority first cites *State v. Gonzalez* (1988) 206 Conn. 391 [538 A.2d 210, 213], where the court said that "a defendant must establish by a preponderance of the evidence a prima facie case of purposeful discrimination." But Connecticut adhered to that rule for only a year. In 1989 the Connecticut Supreme Court, under its authority to supervise the administration of justice, abolished the prima facie case requirement and established a one-stage procedure. (*State v. Holloway* (1989) 209 Conn. 636 [553 A.2d 166, 171-172].) Quoting a decision of the South Carolina Supreme Court, the Connecticut Supreme Court said: " 'Rather than deciding on a case by case basis whether the defendant is entitled to a hearing based upon a *prima facie* showing of purposeful discrimination under the vague guidelines set forth by the United States Supreme Court, the better course to follow would be to hold a *Batson* hearing on the defendant's request whenever the defendant is a member of a cognizable racial group and the prosecutor exercises peremptory challenges to remove members of defendant's race from the venire.' " (*State v. Holloway, supra,* 553 A.2d at p. 172, fn. 4, quoting *State v. Jones* (1987) 293 S.C. 54 [358 S.E.2d 701, 703].)

The majority also cites *Stanley v. State* (1988) 313 Md. 50 [542 A.2d 1267], which said that the defendant must "prove by a preponderance of the evidence that the peremptory challenges were exercised in a way that shifts the burden of production to the State." (*Id.* at p. 1277.) But *Stanley* goes on to quote a decision of the Florida Supreme Court that in evaluating a defendant's showing, " 'any doubt as to whether the complaining party has met its initial burden should be resolved in that party's favor.' " (*Ibid.,*

---

[4] See *Cooperwood v. Cambra, supra,* 245 F.3d at page 1046; *Jordan v. Lefevre* (2d Cir. 2000) 206 F.3d 196, 200; *Wade v. Terhune, supra,* 202 F.3d at page 1197; *Cent. Ala. Fair Housing Center v. Lowder Realty* (11th Cir. 2000) 236 F.3d 629, 636-637; *Tolbert v. Page* (9th Cir. 1999) 182 F.3d 677, 679; *Tankleff v. Senkowski* (2d Cir. 1998) 135 F.3d 235, 249; *Mahaffey v. Page* (7th Cir. 1998) 162 F.3d 481, 485; *Burks v. Borg* (9th Cir. 1994) 27 F.3d 1424, 1428; *U.S. v. Johnson* (8th Cir. 1989) 873 F.2d 1137, 1140; *U.S. v. Chinchilla* (9th Cir. 1989) 874 F.2d 695, 698; *U.S. v. Chalan* (10th Cir. 1987) 812 F.2d 1302, 1314; *Valdez v. People* (Colo. 1998) 966 P.2d 587, 590.

quoting *State v. Slappy* (Fla. 1988) 522 So.2d 18, 22.) Finally, *Stanley* established a bright-line rule that the exclusion of every member of defendant's racial group established a prima facie case. (*Stanley,* at p. 1284.)

The majority derives its standard not from lower court decisions that directly address the burden of establishing a prima facie case under *Wheeler* or *Batson,* but from references in *Miller-El, supra,* 537 U.S. 322 [123 S.Ct. 1029], and *Batson, supra,* 476 U.S. 79, to cases under title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) involving alleged invidious discrimination in connection with employment. Although neither *Miller-El* nor *Batson* involved the standard for proof of a prima facie case, the majority views the high court's references as a general endorsement of title VII standards and procedures for use in evaluating *Batson* motions. And the majority asserts that in a title VII case, to establish a prima facie case, the plaintiff must prove that unlawful discrimination is more likely than not. (See maj. opn., *ante,* at pp. 1314-1315.)

The majority's analysis, however, oversimplifies and misunderstands title VII procedure. A title VII plaintiff has the ultimate burden of proving discrimination by a preponderance of the evidence, but whether a plaintiff has met that burden is assessed at the last stage in the procedure. To establish a prima facie case in the first stage, a title VII plaintiff is *not* required to show it is more likely than not that the defendant engaged in illegal discrimination. Instead, the title VII plaintiff is required to prove *facts* from which one can *infer* illegal discrimination.

In *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 [93 S.Ct. 1817, 36 L.Ed.2d 668] and later cases, the high court said that a plaintiff alleging unlawful discrimination must, to establish a prima facie case, prove certain specific facts and actions [5] "from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a discriminatory criterion illegal under the Act.'" (*Furnco Construction Corp. v. Waters* (1978) 438 U.S. 567, 576 [98 S.Ct. 2943, 2949, 57 L.Ed.2d 957], quoting *Teamsters v. United States* (1977) 431 U.S. 324, 358 [97 S.Ct. 1843, 1866, 52 L.Ed.2d 396].)

*Texas Dept. of Community Affairs v. Burdine* (1981) 450 U.S. 248 [101 S.Ct. 1089, 67 L.Ed.2d 207], a title VII case, further explained this same

---

[5]The specific facts and actions the plaintiff must prove to establish a prima facie case of discriminatory purpose under *McDonnell Douglas* are: "(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." (*McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at p. 802 [93 S.Ct. at p. 1824].)

standard. It said: "The burden of establishing a prima facie case of disparate treatment is not onerous. The plaintiff must prove by a preponderance of the evidence that she applied for an available position for which she was qualified, but was rejected under circumstances which *give rise to an inference of unlawful discrimination.*" (*Burdine, supra,* 450 U.S. at p. 253 [101 S.Ct. at p. 1094], italics added, fn. omitted.)

The next major decision, *St. Mary's Honor Center v. Hicks* (1993) 509 U.S. 502 [113 S.Ct. 2742, 125 L.Ed.2d 407], addressed the question whether the trial court in a title VII action must give summary judgment for the plaintiff if the court had found a prima facie case and determined that the employer's explanation of its action was pretextual. The United States Supreme Court held that the trial court need not give judgment for the plaintiff under those circumstances. The court explained that once a plaintiff has proved facts that give rise to a prima facie case, a presumption of discriminatory purpose arises. The presumption serves the practical function of inducing the defendant to offer an explanation for its actions. (*Id.* at p. 510, fn. 3 [113 S.Ct. at pp. 2748-2749].) Once the defendant offers the explanation, the presumption disappears, and the trial court must decide whether a preponderance of the evidence shows that the employer acted with a discriminatory purpose. (*Id.* at pp. 509-510 and fn. 3 [113 S.Ct. at pp. 2748-2749].)

In *Reeves v. Sanderson Plumbing Products, Inc.* (2000) 530 U.S. 133 [120 S.Ct. 2097, 147 L.Ed.2d 105] (*Reeves*) the high court again explained title VII procedure. At issue in *Reeves* was whether the trial court must give judgment for the defendant if the plaintiff presented no additional evidence to rebut the defendant's explanation of its actions. The court said the defendant was not automatically entitled to judgment under these circumstances; instead, the trier of fact still had the duty to determine at the last stage of the procedure whether the plaintiff had proved discriminatory purpose by a preponderance of the evidence. (*Id.* at pp. 142-143 [120 S.Ct. at pp. 2105-2106].) That decision should take into account "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false," and the other evidence, if any, presented by the parties. (*Id.* at pp. 148-149 [120 S.Ct. at p. 2109].)

The high court's insistence that the trial court determine whether a defendant acted with discriminatory purpose at the last stage, regardless of the falsity or weakness of the defendant's explanation of its actions, is consistent with its language asserting that at the first stage the plaintiff need only prove facts from which discriminatory purpose can be inferred. It would, however, be difficult to reconcile the United States Supreme Court's

position with the view of the majority here. Under the majority's view, when the trial court finds a prima facie case it necessarily finds that the plaintiff has shown it is more likely than not that the employer had a discriminatory purpose. If the employer offers no persuasive explanation, then the trial court, having already found that the plaintiff has met the burden of proof, would have to find for the plaintiff. That indeed is what the Eighth Circuit Court of Appeals held in *Hicks v. St. Mary's Honor Center* (8th Cir. 1992) 970 F.2d 487, and the high court's decision reversing the circuit court's decision (*St. Mary's Honor Center v. Hicks, supra,* 509 U.S. 502) shows that the Supreme Court does not consider a finding of a prima facie case the equivalent of a finding that the plaintiff has proved discriminatory purpose.

*Gay v. Waiters' and Dairy Lunchmen's Union* (9th Cir. 1982) 694 F.2d 531, a title VII case, explains in more detail the proof of a prima facie case under *McDonnell Douglas*: ". . . *McDonnell Douglas* says nothing directly about the need to prove discriminatory intent. '[T]he evident thought was that proof of the four elements warranted an inference of such intent unless the defendant presented at least some evidence in rebuttal.' *Lieberman v. Gant,* 630 F.2d 60, 63 (2d Cir. 1980) (footnote omitted). . . . [¶] Viewed in this light, the role of the *McDonnell Douglas* prima facie case is closely analogous to its role in general civil litigation: it presents the legal question whether the plaintiff has met his burden of production, coming forward with sufficient probative evidence to permit a rational jury, or court, to find the material facts in his favor, thus avoiding a directed verdict or motion for judgment as a matter of law. A prima facie case of intentional discrimination is established if the plaintiff proves facts 'from which one can infer, if such actions remain unexplained, this it is more likely than not' that the defendant's conduct was racially motivated. *Furnco Construction Corp. v. Waters,* [*supra,*] 438 U.S. 567, 576 [98 S.Ct. 2943, 2949] . . . . As an inference, it can but need not result in an ultimate judgment for the plaintiff. In other words, a prima facie case under *McDonnell Douglas* is one in which the plaintiff has met his immediate burden of production, but not necessarily his ultimate burden of persuasion." (*Gay v. Waiters' and Dairy Lunchmen's Union, supra,* 694 F.2d at p. 543, fn. 10.)

*Tompkins v. State* (Tex.Crim.App. 1987) 774 S.W.2d 195, 201, a *Batson* case, relied on title VII cases for the principle that: "A prima facie case represents the minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true."

*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317 [100 Cal.Rptr.2d 352, 8 P.3d 1089] also described the title VII procedure. This court said that the purpose of the prima facie case requirement was "to eliminate at the outset

the most patently meritless claims, as where the plaintiff is not a member of the protected class or was clearly unqualified . . . ." (*Guz*, at p. 354.) "While the plaintiff's prima facie burden is 'not onerous' [citation], he must at least show ' "actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a [prohibited] discriminatory criterion . . . .' " ' [Citations.]" (*Id.* at p. 355.) What actions, when proved by a preponderance of the evidence, give rise to an inference of unlawful discrimination under title VII procedure? The cases answer this question; they are those actions that, *if unexplained*, permit a reasonable inference of an improper purpose or motive. (*Texas Dept. of Community Affairs v. Burdine, supra*, 450 U.S. at p. 254 [101 S.Ct. at p. 1094]; *Furnco Construction Corp. v. Waters, supra*, 438 U.S. at p. 576 [98 S.Ct. at p. 2949].) I focus on the italicized phrase, because it is here that the trial court went wrong in the case before us.

The ultimate issue raised by a *Wheeler-Batson* motion is not whether the trial judge, or an appellate court, can find a possible neutral reason why a prosecutor might want to challenge a juror, but whether the prosecutor's actual reason for the challenge was based on group bias. "[T]he trial court must determine not only that a valid reason existed but also that the reason actually prompted the prosecutor's exercise of the particular peremptory challenge." (*People v. Fuentes* (1991) 54 Cal.3d 707, 720 [286 Cal.Rptr. 792, 818 P.2d 75]; *People v. Turner* (1986) 42 Cal.3d 711, 721 [230 Cal.Rptr. 656, 726 P.2d 102].)[6]

The threshold for establishing a prima facie case should be relatively low, so that close cases are not decided at the first stage of the inquiry, but only after the trial judge has heard the prosecutor's explanations and is in a better position to determine the propriety of the challenges. In fact, this may be the common practice. This court frequently encounters cases in which the pattern of challenges suggests but does not prove discriminatory purpose and the trial judge asks for an explanation without expressly finding a strong likelihood that the challenges were improper. (See, e.g., *People v. Arias, supra*, 13 Cal.4th 92, 136; *People v. Jackson* (1996) 13 Cal.4th 1164, 1197 [56 Cal.Rptr.2d 49, 920 P.2d 1254].) At times prosecutors even volunteer an explanation without being asked. (See, e.g., *People v. Williams* (1997) 16 Cal.4th 635, 664 [66 Cal.Rptr.2d 573, 941 P.2d 752]; *People v. Howard* (1992) 1 Cal.4th 1132, 1153, fn. 3 [5 Cal.Rptr.2d 268, 824 P.2d 1315].)

---

[6]In title VII cases, the trial court may find for the employer defendant even if the reason it gave was a sham, if the evidence shows that the defendant gave the false explanation to conceal something other than discrimination, and had a nondiscriminatory reason for its action. (See *Reeves, supra,* 530 U.S. at p. 148 [120 S.Ct. at p. 2108].) But the nondiscriminatory reason must be the *defendant's* reason.

Establishing a low threshold for a prima facie case recognizes that the prosecutor's explanation is often critical to the decision whether the challenge was proper: just as a reasonable explanation will dispel the suspicion of group bias, "[p]roof that [an] explanation is unworthy of credence is . . . probative of intentional discrimination, and it may be quite persuasive." (*Reeves, supra,* 530 U.S. at p. 147 [120 S.Ct. at p. 2108] [title VII case].) The approach set out by the majority would, by contrast, compel trial judges to make decisions when they can only speculate as to the basis for the challenges.

Here defendant showed that the prosecutor challenged all three Blacks on the jury panel, used a disproportionate number of his peremptory challenges against members of that racial group, and failed to engage in any questioning whatever of any these prospective jurors notwithstanding invitations to do so by the trial court. With respect to two of the three jurors, there is nothing in their oral or written responses that stands out to show they would be unacceptable jurors.

Of course there still may be neutral explanations for the challenges, and if it is apparent that the prosecutor had neutral reasons for the challenges, then the pattern of challenges would not give rise to an inference of discriminatory purpose. In such cases the trial court need not find a prima facie case. (See *People v. Bittaker* (1989) 48 Cal.3d 1046, 1092 [259 Cal.Rptr. 630, 774 P.2d 659]; *People v. Howard, supra,* 1 Cal.4th 1132, 1205 (dis. opn. of Kennard, J.).) But that rule should not apply when the trial court can only speculate on the basis for the challenges. (*Howard, supra,* at p. 1207.) The prosecutor does not need to have reasonable grounds for challenging a juror; the challenge passes constitutional scrutiny if it is based on any nondiscriminatory ground. (See *Purkett v. Elem* (1995) 514 U.S. 765, 768 [115 S.Ct. 1769, 1771, 131 L.Ed.2d 834] [prosecutor did not like juror's haircut].) The ability of the trial court to find such a neutral explanation should not defeat the defendant's prima facie case when it is not apparent that the explanation was the true reason for the challenge. In the case before us, for example, the trial court said one reason for the prosecution's challenge of Prospective Juror S.E. could have been her answer to question No. 63 on the juror questionnaire. In that answer, S.E. expressed sympathy for the *victim.* Such sympathy would have been a neutral basis for a challenge, but was not an obvious basis for a prosecution challenge because a prosecutor would generally view a juror who expressed sympathy for the victim as a favorable juror. The other explanations for the prosecutor's challenges suggested by the trial court are also implausible. Thus, the pattern of prosecution challenges here created a reasonable inference of discriminatory purpose, which in the absence of any explanation from the prosecutor is not overcome by the possibility that the challenges could have been based on neutral grounds.

The trial court should have found a prima facie case and asked the prosecutor to explain the basis for the challenges. The court's failure to do so is error, and reversible per se. (See *People v. Fuentes, supra,* 54 Cal.3d at p. 715; *People v. Snow* (1987) 44 Cal.3d 216, 226-227 [242 Cal.Rptr. 477, 746 P.2d 452]; *People v. Turner, supra,* 42 Cal.3d at p. 728.)