Filed 6/4/21  P. v. Wilson CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MARKEE WILSON,<br><br>    Defendant and Appellant. | B300876<br><br>(Los Angeles County<br>Super. Ct. No. BA466320) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Maame Ewusi-Mensah Frimpong, Judge. Affirmed.

Julie Caleca, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and Daniel C. Chang, Deputy Attorney General, for Plaintiff and Respondent.

_____

A jury found Markee Wilson guilty of selling cocaine. Wilson attacks his jury selection and the sufficiency of the evidence of the sale. He also raises evidentiary issues. We affirm.

Undesignated statutory citations are to the Penal Code.

I

An amended information charged Wilson with selling cocaine base (Health & Saf. Code, § 11352, subd. (a)) on August 25, 2017 (count 1) and on June 13, 2017 (count 2). The information alleged Wilson committed the offenses for a gang (§ 186.22, subd. (b)(1)(A)).

During jury selection, Wilson made a *Batson/Wheeler* motion, which the court denied. (See *Batson v. Kentucky* (1986) 476 U.S. 79, 88 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258, 276–277 (*Wheeler*).) We recount details about jury selection and this motion later in the opinion.

In 2016, the Los Angeles Police Department and the Federal Bureau of Investigations formed a joint task force to investigate a gang called the Rollin' 40s. The focus of this investigation was a shopping complex that gang members frequented. The task force used informants who bought drugs. Wilson's case stemmed from this investigation.

The jury heard five days of trial testimony. A detective, two police officers, two criminalists, and an informant testified for the prosecution. Wilson, a private investigator, and a gang expert testified for the defense.

The detective, Daniel Hernandez, testified about the process of documenting controlled drug buys. The informant would wear a microphone to provide audio to Hernandez. The

2

informant also wore a separate audio/video recorder that Hernandez did not view live. During the August buy, a surveillance team relayed radio information to Hernandez about what was happening.

The prosecution played the audio/video recording from the August buy for the jury during Hernandez's and the informant's testimony. The court admitted this video in evidence.

During the August buy, Wilson was in the passenger's seat of the car of one Mitchell Taylor, who sat in the driver's seat. The informant testified he approached the car and bought cocaine from Wilson. The informant first gave his money, $20, to Taylor. The informant saw Taylor pass the money to Wilson. The informant went to the passenger side, where Wilson gave him $10 worth of cocaine. Wilson did not have the full $20 worth of cocaine and he called someone else over to bring more cocaine.

The prosecution did not present audio/video recording of the alleged June buy. Hernandez said this video was lost.

Wilson testified he joined the Rollin' 40s gang when he was 16 or 17 years old. He said he worked at a pet store in the shopping complex. Wilson admitted selling drugs in the past but denied selling drugs at the times in question.

The jury found Wilson guilty of count 1, the August sale, and found the gang allegation true. It acquitted Wilson of count 2.

The court sentenced Wilson to three years in state prison for count 1. It struck the punishment for the gang enhancement.

## II

Wilson, a black man, challenges the trial court's denial of his *Batson/Wheeler* motion. Specifically, he says the prosecutor's reasons for excusing three jurors were pretextual and the trial

3

court erred by finding otherwise.  He is incorrect under current law.

A

We recount the relevant portions of voir dire.

The court and counsel questioned 40 prospective jurors. Wilson's challenge focuses on prospective Jurors No. 3, 7, and 23, all African American men.  (For simplicity, we eliminate the word "prospective" when we refer to these jurors for the remainder of the opinion.  We use "African American" because trial counsel and the court used this designation.)

The court questioned jurors for one day.  The next day, defense counsel and the prosecution questioned jurors for about 30 minutes each.

Juror No. 3 raised his hand when the court asked whether any jurors or "anyone close to you" believed controlled substances such as cocaine base should be legalized.  The prosecutor questioned Juror No. 3 about this belief the next day.  Juror No. 3 believed all drugs, "all the way up to heroin" should be legalized. The prosecutor asked whether Juror No. 3 could follow the law despite this belief.  He responded, "I think so."  The prosecutor said, "You seemed a little hesitant" and asked him to explain his thinking.  He replied, "It would depend—I was just thinking about it is not just finding fact.  You have to think about that individual who is going to be punished for that."  The prosecutor explained the court would instruct the jury not to consider punishment when reaching its verdict and asked whether Juror No. 3 would follow that instruction.  He said, "I will try to, yes."

In a separate line of questioning, the prosecutor offered a hypothetical.  "Johnny Appleseed is on trial for stealing just one grape.  I'm sure all of us have done it.  We go to the grocery store.

We want to make sure the fruit is ripe. So we pick a little grape or a little cherry and take a little bite of it. Technically, it is a theft. Infraction, but theft. [¶] Now let's say that Johnny Appleseed is brought into court and is on trial for stealing just that one grape. Witnesses come in and testify. There's video surveillance. You see Johnny Appleseed going into the grape aisle and taking one grape and eating it and leaving the store without paying. [¶] Under those facts . . . do you have any issues returning a verdict of guilty?" Juror No. 3 would not convict the hypothetical grape pilferer.

Juror No. 7 raised his hand when the court asked whether any jurors were familiar with the Rollin' 40s street gang. Juror No. 7 did not personally know any gang members.

Juror No. 7 responded affirmatively to three of defense counsel's questions about gangs: (1) whether gangs are created because of society; (2) whether people who join gangs have a choice, and (3) whether people join gangs for protection.

Defense counsel asked Juror No. 7 to explain his belief gangs were created because of society. Juror No. 7 replied, "I think there are a lot of factors that contribute to the formation of gangs, including—it goes back in history from probably the '60s, '70s, when the drug epidemic started to really become prevalent. But even before that, the gangs originated as a way to be a part of your community. It wasn't always—it always didn't have this negative aspect to it. And when the drug epidemic came in is when it started to switch a little bit. More violence took place within and in between gangs. [¶] But originally I do believe that gangs were formed more for up lifting communities. They were really about people bonding together. Obviously, the way that the U.S. was formed, certain people were marginalized, and this

was the only way they felt they could uplift each other to kind of form those types of groups."

The next day, the prosecution questioned Juror No. 7 twice relating to these responses. First, the prosecutor mentioned that some jurors believed society causes people to join gangs. Then she said, "you're going to be asked to be the factfinders in this case and only determine what happened. [¶] Can everyone do that?" She asked Juror No. 7 individually and he responded "Yes." Second, the prosecutor listed Juror No. 7 and other jurors who said they were familiar with the Rollin' 40s gang and asked whether they knew any members of that gang. Juror No. 7 did not respond, meaning he did know any members of that gang.

Juror No. 23 was a case manager for a re-entry program for men who have been involved in the criminal justice system.

Juror No. 23's aunt was murdered in 2001 and his brother was shot and paralyzed in 2002. He was not satisfied with the efforts of law enforcement, who failed to find the perpetrators. Juror No. 23's mother and a number of other women in his family were victims of domestic abuse. He was not satisfied with the efforts of law enforcement in those incidents, either. He estimated 30 close family members, including his mother, father, and siblings, had been "charged, investigated, and incarcerated for numerous different types of crimes." He thought the legal system did not treat his parents fairly in "some cases" and did not treat his siblings fairly in "most cases."

The parties stipulated to excuse five jurors for cause.

The prosecutor unsuccessfully challenged three jurors—Jurors No. 1, 3, and 4—for cause based on their negative response to the grape hypothetical. According to the prosecutor, this response meant they could not follow the law when a small

6

quantity was at issue, which was important because Wilson's case involved a small amount of drugs. The court rejected the for-cause challenge and said the grape hypothetical did not have much import. "I'm not even really sure if counsel is correct, that that would be a crime to steal one grape. So I think the jurors may have gotten lost in the hypothetical." The court also explained these three jurors had either said they could follow the law in other exchanges during voir dire or did not say anything else to prove the jurors could not follow the law or be fair. Thus the court determined the grape hypothetical alone did not support a for-cause challenge against them.

The parties moved to peremptory challenges. The prosecution used its second, third, and sixth challenges to excuse Jurors No. 3, 7, and 23, respectively.

After the prosecutor asked to excuse Juror No. 23, the defense made a *Batson*/*Wheeler* motion. Juror No. 23 was the last African American man left in the venire. The defense had previously excused a fourth African American man.

The court found the defense made a prima facie showing and requested the prosecutor's justification.

The prosecutor said Juror No. 3 "was one of the jurors that I gave the grape hypothetical to about drugs and whether or not he could still follow the law even if it was a [de minimis] amount, which is why I also excused Juror No. 1. [¶] I intend to also excuse Juror No. 4."

Juror No. 7 "was talking a lot about gangs and social problems. And I felt that his belief about [why] members would join gangs, that they don't have a choice or they need protection would—he would be bias[ed] in this case."

Juror No. 23's "social work" background "is generally what I don't like on my . . . juries." The prosecutor explained she had excused Juror No. 19 for the same reason.

The court asked defense counsel if he had anything further to add. He responded only, "Your honor, the one thing [the three prospective jurors] could provide is an understanding that maybe other nonwhites—nonwhite[] jurors will not know. I think they would be great jurors."

The court asked counsel for a moment and there was a pause in the proceedings. Then the court denied the *Batson/Wheeler* motion, offering the following reasons. "[W]ith respect to Juror No. 3, the views on legalization of drugs and his response to the grape hypothetical, the court finds that to be genuine and not pretextual." ". . . Juror No. 7 was one of the jurors who indicated that society creates gangs and people maybe don't have a choice to join gangs. The court finds that's a genuine reason and not pretextual, especially in this circumstance." "[T]he court recalls that [Juror No. 23] specifically stated that he works on re-entry programs and talked extensively about that, the court finds that's a genuine reason and not a pretextual reason."

The court did not report the racial composition of the seated jury. (See *People v. Lenix* (2008) 44 Cal.4th 602, 610, fn. 6 [if a party has made a *Batson/Wheeler* motion, "it is helpful for the record to reflect the ultimate composition of the jury"] (*Lenix*).)

### B

The state and federal constitutions prohibit counsel from using peremptory challenges to exclude jurors based on race, gender, or other protected characteristics. (*Wheeler*, *supra*, 22

Cal.3d at pp. 276–277; *Batson, supra*, 476 U.S. at pp. 88–89.) The Constitution forbids striking a juror for a discriminatory purpose. (*Snyder v. Louisiana* (2008) 552 U.S. 472, 478.)

Courts apply the well-established three-step *Batson* inquiry to motions alleging discriminatory use of peremptory challenges. This procedure also applies to state constitutional claims. (*Lenix, supra*, 44 Cal.4th at pp. 612–613.)

First, the defendant must make a prima facie showing that the totality of the facts raises an inference of discriminatory purpose. Second, the burden shifts to the prosecutor to rebut a prima facie showing by giving an adequate nondiscriminatory explanation for the challenges. Third, if the prosecutor has tendered a neutral explanation, the court must decide whether the defendant has proven racial discrimination. (*Johnson v. California* (2005) 545 U.S. 162, 168.)

We presume prosecutors exercise peremptory challenges constitutionally and the defendant bears the burden of rebutting that presumption. (*People v. Johnson* (2015) 61 Cal.4th 734, 755.) A prosecutor's justification, moreover, "need not support a challenge for cause, and even a 'trivial' reason, if genuine and neutral, will suffice." (*People v. Arias* (1996) 13 Cal.4th 92, 136 (*Arias*).) For the defendant to prevail, it must be more likely than not that the prosecutor had an improper motivation for the challenge. (*People v. Mai* (2013) 57 Cal.4th 986, 1059 (*Mai*).)

We are concerned here with the third step. Central to the trial court's evaluation at this step is the credibility of the prosecutor's explanation. The court may consider the circumstances of the case; contemporaneous observations of voir dire, including the prosecutor's demeanor; the reasonability of the step two explanation; and the judge's own legal experience and

knowledge of trial techniques.  (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1158–1159 (*Gutierrez*).)

When assessing the viability of the prosecution's justifications for a peremptory challenge, trial courts and reviewing courts must examine only those reasons the prosecution actually expressed.  (*Gutierrez*, *supra*, 2 Cal.5th at p. 1167; *Miller-El v. Dretke* (2005) 545 U.S. 231, 251–252 (*Miller-El*) [explaining prosecutors must state their reasons as best as they can and "stand or fall" on the plausibility of those reasons].)

We review the trial court's determination of a prosecutor's justification for exercising peremptory challenges with "great restraint."  (*Arias*, *supra*, 13 Cal.4th at p. 136.)  If the trial court makes a sincere and reasoned effort to evaluate the prosecution's justifications, its conclusions are entitled to deference on appeal when they are supported by substantial evidence.  (*People v. Johnson*, *supra*, 61 Cal.4th at p. 755.)  We give great deference to the trial court's ability to distinguish between bona fide reasons and sham excuses.  (*Ibid.*)

Wilson raises comparative juror analysis on appeal, so we review this area of the *Batson/Wheeler* framework.  This analysis compares challenged prospective jurors with similarly situated but unchallenged prospective jurors who are not members of the challenged prospective juror's protected group.  (*Gutierrez*, *supra*, 2 Cal.5th at p. 1173; and see *Miller-El*, *supra*, 545 U.S. at p. 241.) This analysis may be probative of purposeful discrimination. (*Miller-El*, at p. 241.)  We must undertake comparative juror analysis even if the defendant raises it for the first time on appeal, so long as the record is adequate to permit the comparisons.  (*Gutierrez*, at p. 1174.)  There are, however,

10

"inherent limitations" to doing so on a "cold appellate record." (*Lenix*, *supra*, 44 Cal.4th at p. 622.)

Some of the "inherent limitations" are apparent here. For example, the record does not disclose the race of most members of the seated jury and it does not disclose the gender of some members. The record does disclose, however, that none of the seated jurors were African American men. We perform the comparative analysis with its limits in mind.

Comparative juror analysis is more than an exercise in identifying *any* conceivable distinction between prospective jurors. "Rather, because the ultimate question before us concerns the prosecutor's motivations in exercising the challenge in question, we must ask whether there were any *material* differences among the jurors—that is, differences, other than race, that we can reasonably infer motivated the prosecutor's pattern of challenges." (*People v. O'Malley* (2016) 62 Cal.4th 944, 977 (*O'Malley*).) "[D]ifferences among the jurors generally will be more probative if they closely relate to reasons the prosecutor has stated for a peremptory challenge." (*People v. Miles* (2020) 9 Cal.5th 513, 544 (*Miles*).)

Contrary to Wilson's assertion, because he has raised the issue of comparative juror analysis for the first time on appeal, we may consider grounds the prosecution did not articulate at trial when *comparing* jurors. The Supreme Court has consistently weighed in on this issue: "when conducting comparative juror analysis for the first time on appeal, we need not turn a blind eye to reasons the record discloses for not challenging other jurors." (*Miles*, *supra*, 9 Cal.5th at p. 543; accord *O'Malley*, *supra*, 62 Cal.4th at p. 977; *People v. Chism* (2014) 58 Cal.4th 1266, 1319 (*Chism*); *People v. Jones* (2011) 51

11

Cal.4th 346, 365–366.)  The prevailing logic is that if the defendant had raised the comparative juror issue at trial, the prosecutor could have offered more specific reasoning for keeping one juror and not another.  As to our comparative juror analysis, we will consider grounds the prosecution did not articulate at trial.

C

Substantial evidence supports the trial court's ruling that the prosecutor provided genuine and not pretextual reasons for challenging the three jurors.  We take each juror in turn.

1

Substantial evidence supports the trial court's finding regarding the prosecutor's reasoning for challenging Juror No. 3.  The prosecutor had explained her belief the grape hypothetical provided valuable information about jurors' ability to follow the law even when a small quantity was at issue.  This was relevant to Wilson's case.  The prosecutor first offered this ground as a for-cause challenge, which tends to show she believed it was important.  The fact the court denied the for-cause challenge is not dispositive.  (*Arias*, *supra*, 13 Cal.4th at p. 136 [justification need not support a challenge for cause].)  This evidence supports the genuine nature of the prosecution's explanation.

The prosecutor's treatment of Juror No. 1 is also proof the prosecutor's reasoning was genuine.  The prosecutor used her first peremptory challenge against Juror No. 1, who was not an African American man and who gave the same response to the hypothetical as Juror No. 3.

The trial court improperly relied on a ground the prosecution did not state—Juror No. 3's opinion about legalizing

12

drugs—but the grape hypothetical alone provides sufficient support and we affirm on this ground.

For the first time on appeal, Wilson raises a comparative juror analysis of Jurors No. 3 and 9, but the comparison does not change the result. Wilson says the prosecutor's reasoning about the grape hypothetical was pretext because the prosecutor did not excuse Juror No. 9, who responded the same way about this hypothetical. For this comparative juror analysis, we may consider other unstated grounds. Juror No. 3's views on drugs materially distinguish him from Juror No. 9. Juror No. 3 believed cocaine and other drugs should be legalized, a view Juror No. 9 did not share. The prosecutor could validly find this opinion pertinent to a case alleging cocaine sales. Juror No. 3's equivocal statements about "think[ing]" he could follow the law and "try[ing]" not to consider the punishment do not invalidate the prosecution's concern. The comparison of Juror No. 3 and Juror No. 9 does not show the prosecution had an improper motive.

2

Substantial evidence also supports the trial court's finding regarding the prosecutor's reasoning for challenging Juror No. 7. This prospective juror had heard of Wilson's gang, believed people joined gangs for protection, and believed society created gangs. Regarding the creation of gangs, Juror No. 7 said, "gangs originated as a way to be a part of your community . . . . [G]angs were formed more for up lifting communities. They were really about people bonding together." Additionally, he said forming gangs was the "only way [marginalized groups] felt they could uplift each other." Wilson's case included gang allegations and prospective jurors' views about how gangs formed and why people

13

join them could affect their decisions about the allegations. The trial court could find the prosecution's reasoning about these gang responses genuine.

We note that one of the prosecutor's grounds for striking Juror No. 7 conflicts with the record. Given the circumstances, we do not consider that ground as a compelling reason for the peremptory challenge, nor as proof of discrimination. The ground was Juror No. 7's response to defense counsel's question about whether people who join gangs have a choice. Juror No. 7 said yes, which meant he believed people who join gangs *do* have a choice. The prosecutor incorrectly said this response had the opposite meaning and cited it to demonstrate Juror No. 7 might be biased in favor of gang members.

Our Supreme Court has addressed the issue of mistakes in prosecutor's step two explanations. "[A] genuine 'mistake' is a race-neutral reason." (*People v. Williams* (1997) 16 Cal.4th 153, 189.) Although "an isolated mistake or misstatement that the trial court recognizes as such is generally insufficient to demonstrate discriminatory intent [citation], it is another matter altogether when . . . the record of voir dire provides no support for the prosecutor's stated reasons for exercising a peremptory challenge and the trial court has failed to probe the issue." (*People v. Silva* (2001) 25 Cal.4th 345, 385.) When a prosecutor posits multiple reasons for a peremptory challenge and some are implausible or unsupported, this can, in some circumstances, "fatally impair the prosecutor's credibility." (*People v. Smith* (2018) 4 Cal.5th 1134, 1157–1158.) A prosecutor's mistake might not provide a compelling reason for a peremptory challenge, but neither does the mistake alone necessarily establish the

14

prosecutor's stated reasons were pretextual. (See *O'Malley*, *supra*, 62 Cal.4th at p. 980.)

Here, the trial court did not notice the discrepancy and did not probe this issue. After the prosecution offered its reasons, the court asked defense counsel if he had anything further to add. He did not mention this issue. Defense counsel's silence is not dispositive but it is significant, for three reasons. First, defense counsel himself asked the question at issue, making him well-positioned to identify the discrepancy. Second, "[i]f defense counsel had noted [the discrepancy], the prosecutor could have explained herself, and the court could have made a reasoned ruling that we could review." (*People v. Hardy* (2018) 5 Cal.5th 56, 81 (*Hardy*).) And third, the defendant has the ultimate burden of persuasion regarding the prosecutor's motivation. (*O'Malley*, *supra*, 62 Cal.4th at p. 974.)

Our review acknowledges the prosecutor's incorrect ground and we find it does not provide a compelling reason for the peremptory challenge, nor does it prove discrimination.

Wilson says one of the prosecutor's grounds for excusing Juror No. 7 was a response he gave about racism and his experience of racism, but we do not think the prosecutor was referencing that response. The prosecutor's reason for challenging Juror No. 7 included the juror's discussion of "gangs and social problems." The prosecutor did not say more about "social problems," and neither the trial court nor defense counsel probed the matter. On appeal, Wilson says "social problems" was a distinct ground that must refer to Juror No. 7's response about experiencing racism in society. The Respondent's brief does not address "social problems" separately from the gang reasoning. We think the most natural reading of this ground is that "gangs

and social problems" referred to the response we have quoted in which Juror No. 7 explained why he believed society created gangs.  Therefore we do not consider Juror No. 7's experience with racism as a ground upon which the prosecution relied and we do not use it to support or discredit the prosecution's reasoning.

We turn now to comparative juror analysis.  Wilson correctly notes that other jurors from the venire of 40 jurors responded similarly to some of the gang questions.  Fourteen other prospective jurors responded affirmatively to the question of whether society produces gangs.  Five of them ultimately served on the jury.  Seventeen other prospective jurors responded affirmatively to the question about whether people join gangs for protection.  Five of them ultimately served on the jury and two of them served as alternate jurors.  The comparison falters, however, because only Juror No. 7 expounded about the uplifting nature of gangs' origins.  The prosecution could fairly and genuinely see this as a meaningful distinguishing factor.  Additionally, unlike Juror No. 7, none of the seated jurors were familiar with Wilson's gang.

Wilson downplays the import of Juror No. 7's statement about the origin of gangs, but the statement provides context about this prospective juror's beliefs. Wilson asserts the statement was merely about the history of gang formation and Juror No. 7's beliefs about gangs were "entirely impartial."  Juror No. 7 offered a lengthy explanation about gang formation that twice referred to their uplifting origins.  If a person expressed the belief a leader who became a murderous dictator was initially great and uplifting, it would be fair to infer the person might have a mixed or benign attitude about this dictator.  The

16

prosecution could reasonably believe Juror No. 7's statement reflected a positive view of gangs, historically, and therefore a mixed or benign view of present-day gangs that came from these origins. As we have explained, no other juror expressed Juror No. 7's view about the uplifting origins of gangs. The comparison of Juror No. 7 and seated jurors does not reveal the prosecution had an improper motive.

3

Substantial evidence also supports the trial court's finding about the prosecutor's challenge of Juror No. 23. The prosecutor said she typically did not like to have people with Juror No. 23's occupation, social work, on her juries. Under current law, prosecutors may challenge potential jurors whose occupation the prosecutor subjectively believes will not render them the "best type of juror" for the case. (*People v. Reynoso* (2003) 31 Cal.4th 903, 925 (*Reynoso*).)

The prosecutor's treatment of Juror No. 19 also tends to show the prosecutor's reasoning was genuine. The prosecutor used her penultimate peremptory strike before the *Batson/Wheeler* motion to remove Juror No. 19, a social worker who was not an African American man. The court could find the prosecutor's occupation-based reasoning genuine.

Wilson offers an unavailing comparative juror analysis. He says the prosecution's acceptance of Juror No. 17, a psychotherapist working in community mental health, means the prosecution's reasoning was pretextual. Assuming psychotherapists and social workers are comparable, we may consider other grounds because Wilson raises this comparison for the first time on appeal. The prosecution points to Juror No. 23's family's contacts with the legal system, his opinion that law

17

enforcement treated his siblings unfairly, and his dissatisfaction with police efforts in cases involving his aunt and brother. Under current law, negative experience with law enforcement or distrust in the legal system are valid bases for a peremptory challenge. (E.g., *People v. Winbush* (2017) 2 Cal.5th 402, 436, 439.) Wilson does not identify any evidence Juror No. 17 shared Juror No. 23's experiences and views in this area. We have reviewed the record of voir dire, which does not reveal this evidence. Thus these grounds materially distinguish Juror No. 23 from Juror No. 17, and Wilson's comparative argument fails.

D

Our analysis applies current law. We are aware this law will change.

Judges have not been unanimous in their support for the *Batson/Wheeler* framework. (E.g., *Miles, supra*, 9 Cal.5th at pp. 606–617 (dis. opn. of Liu, J.); *People v. Armstrong* (2019) 6 Cal.5th 735, 800–816 (dis. opn. of Liu, J., joined by Cuéllar, J. and Perluss, J. (sitting by appointment)); *People v. Johnson* (2019) 8 Cal.5th 475, 528–547 (dis. opns. of Liu, J. and Cuéllar, J); *People v. Rhoades* (2019) 8 Cal.5th 393, 456–470 (dis. opn. of Liu, J.); *Hardy, supra*, 5 Cal.5th at pp. 107–125 (dis. opn. of Liu, J.); *People v. Reed* (2018) 4 Cal.5th 989, 1019–1031 (dis. opns. of Liu, J. and Kruger, J.); *Chism, supra*, 58 Cal.4th at pp. 1338–1353 (conc. & dis. opn. of Liu, J., dissenting as to *Batson/Wheeler* portion of maj. opn.); *People v. Williams* (2013) 56 Cal.4th 630, 698–728 (dis. opns. of Werdegar, J. and Liu, J.); *People v. Jones, supra*, 51 Cal.4th at pp. 382–385 (dis. opn. of Werdegar, J., joined by Moreno, J.); *Reynoso, supra*, 31 Cal.4th at pp. 929–945 (dis. opn. of Kennard, J., joined by Werdegar, J. and Moreno, J., and dis. opn. of Moreno, J., joined by Kennard, J. and Werdegar, J.);

18

*People v. Johnson* (2003) 30 Cal.4th 1302, 1329–1341 (dis. opn. of Kennard, J., joined by Werdegar, J.), judg. revd. on *Batson*/*Wheeler* grounds by U.S. Supreme Ct. in *Johnson v. California, supra*, 545 U.S. 162); *People v. Boyette* (2002) 29 Cal.4th 381, 468–472 (dis. opn. of Kennard, J.); *People v. Ayala* (2000) 24 Cal.4th 243, 291–300 (dis. opn. of George, C.J., joined by Kennard, J.); *People v. Jones* (1997) 15 Cal.4th 119, 204–205 (dis. opn. of Mosk, J.), maj. opn. overruled on grounds unrelated to *Batson*/*Wheeler* in *People v. Hill* (1998) 17 Cal.4th 800; *People v. Cummings* (1993) 4 Cal.4th 1233, 1343–1344 (dis. opn. of Mosk, J.), maj. opn. abrogated on grounds unrelated to *Batson*/*Wheeler* in *People v. Merritt* (2017) 2 Cal.5th 819; *People v. Johnson* (1989) 47 Cal.3d 1194, 1254–1295 (dis. opn. of Mosk, J., joined by Broussard, J.), maj. opn. overruled by *Gutierrez, supra*, 2 Cal.5th 1150 on grounds related to *Batson*/*Wheeler* analysis.)

In each case in the last citation, the majority opinion affirmed denials of *Batson*/*Wheeler* motions. Given the near uniformity of affirmances, critics have questioned whether these procedures offer proper vigilance. (E.g., *People v. Harris* (2013) 57 Cal.4th 804, 884–885 & appendix (conc. opn. of Liu, J.) [describing the current framework, including the deferential third step review, and noting, as of 2013, the Supreme Court found *Batson*/*Wheeler* error in just one of 102 cases].)

There has been controversy over justifications courts accept as race-neutral. (E.g., *People v. Triplett* (2020) 48 Cal.App.5th 655, 692 (statement of Liu, J.) ["our case law rewards parties who excuse minority jurors based on ostensibly race-neutral justifications that mirror the racial faultlines in society. This approach is not dictated by high court precedent, and it is

19

untenable if our justice system is to garner the trust of all groups in our communities and to provide equal justice under law."]; *People v. Bryant* (2019) 40 Cal.App.5th 525, 546 (conc. opn. of Humes, P.J.) (*Bryant*) ["Many justifications that have been categorically approved by courts as neutral under [the *Batson*] standard are hardly so."].)  In *Bryant*, Presiding Justice Humes pointed to our state jurisprudence upholding peremptory challenges on the basis of a prospective juror's negative experience with law enforcement, skepticism about the fairness of the legal system, and belief that that system is unfair to particular racial groups.  (*Bryant*, at p. 546.)  "In light of the undeniable evidence that some minority groups—particularly black men—have been overpoliced and subjected to harsher sentences," it hardly seems race neutral to allow prosecutors to strike jurors categorically based on contact with or negative opinions about law enforcement or the judicial system.  (*Ibid*.)

Critics have called for action.  (E.g., *Miles*, *supra*, 9 Cal.5th at p. 617 (dis. opn. of Liu, J.) [asking the Supreme Court to rethink the *Batson* framework "to fulfill the constitutional mandate of eliminating racial discrimination in jury selection"]; (*Bryant*, *supra*, 40 Cal.App.5th at pp. 548–549 (conc. opn. of Humes, P.J.) [encouraging the Legislature, the Supreme Court, and the Judicial Council to act to reduce actual and perceived bias in jury selection].)

In 2020, the Legislature passed Assembly Bill 3070, which enacts changes concerning peremptory challenges.  (Stats. 2020, ch. 318, §§ 1–3.)  The changes are codified in Code of Civil Procedure section 231.7.  Effective for jury trials in which jury selection begins on or after January 1, 2022, the law does not

apply to Wilson's 2019 trial.  (See Code Civ. Proc., § 231.7, subd. (i).)

The law will change the *Batson*/*Wheeler* procedures in ways relevant to Wilson's case.  The new law changes the standard of appellate review.  Appellate courts will review express factual findings for substantial evidence but will otherwise *independently* review the denial of an objection.  (Code Civ. Proc., § 231.7, subd. (j).)

Certain reasons for peremptory strikes will be presumptively invalid, although the presumptions are rebuttable.  These presumptively invalid reasons include distrust of or having a negative experience with law enforcement and employment in a field "that serves a population disproportionately comprised of" people of a certain race, gender, or other protected category. (Code Civ. Proc., § 231.7, subd. (e)(1) & (10).)

Additionally, under the new law, we will consider only reasons the prosecutor actually gives to explain the use of a peremptory challenge or failure to use a peremptory challenge on a similarly situated juror, "regardless of whether the moving party made a comparative analysis argument in the trial court." (Code Civ. Proc., § 231.7, subd. (j).)

In sum, we affirm the denial of Wilson's *Batson*/*Wheeler* motion while noting impending changes will affect future analyses.

III

Sufficient evidence supports Wilson's conviction for selling a controlled substance.

We evaluate claims regarding sufficiency of evidence by reviewing the record in the light most favorable to the judgment below.  We determine whether a reasonable trier of fact could

21

find the defendant guilty beyond a reasonable doubt.  We presume in support of the judgment all facts the jury could reasonably deduce from the evidence.  (*People v. Osband* (1996) 13 Cal.4th 622, 690.)

The jury, not the reviewing court, determines witness credibility and resolves conflicts and inconsistencies in testimony. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

Wilson's conviction was for selling a controlled substance. (Health & Saf. Code, § 11352, subd. (a).)  The Supreme Court has defined the elements of this crime as:  "intentionally sold (transferred to another for cash) a restricted dangerous drug with knowledge of its character."  (*People v. Daniels* (1975) 14 Cal.3d 857, 861; see also CALCRIM No. 2300 [selling means "exchanging a controlled substance for money, services, or anything of value."].)

Wilson incorrectly says the evidence is insufficient to establish he completed a drug sale.  His argument is about whether there was evidence to show Taylor gave the informant's money to Wilson.

The informant's testimony and the video suffice.  An undercover agent's testimony that he purchased drugs from a defendant in a controlled buy can be enough, standing alone, to sustain a conviction.  (*People v. Salas* (1975) 51 Cal.App.3d 151, 154.)  The informant testified Taylor took the money, handed it to Wilson, and told the informant to go to the other side of the car where Wilson sat.  In addition to the informant's testimony, the video showed the informant going to the car and handing the money to Taylor, who shifted toward Wilson.  A reasonable juror could infer from the video that Taylor gave the money to Wilson.

Wilson attacks the credibility of the informant and Officer Hernandez, but the jury was entitled to find them credible as to the August sale.

The informant's testimony and the video constituted substantial evidence.

## IV

Wilson challenges two portions of Hernandez's testimony, but he forfeited these challenges by failing to object properly at trial.

We review a trial court's ruling on the admissibility of evidence for abuse of discretion. (*People v. Benavides* (2005) 35 Cal.4th 69, 90.)

## A

Wilson's first forfeited issue is about Hernandez's testimony about the video. Wilson says Hernandez should not have been allowed to testify about what happened in the video. Wilson challenges three statements. These statements are in the order in which Hernandez made them at trial.

1) Taylor took the money from the informant and "handed it to Mr. Wilson and then told our informant to go around the vehicle to meet with Mr. Wilson so he could get the narcotics, which he just paid money for." Wilson did not object.

2) Hernandez got information about the buy from three sources: listening live to the informant, talking to the informant afterwards, and the video. Hernandez said these sources were "consistent." (Wilson does not challenge on appeal the next sentence of testimony, "At this point, he's calling over another male, which you see in the video, asking for a dime." Wilson objected at trial for lack of

23

foundation and the trial court directed the prosecution to lay a foundation for "that second portion.")

3) The informant gave the money to Taylor, "[a]nd then [the informant] was told to go around, which was not only heard live but also corroborated by the video again. And then the actions of Mr. Wilson handing narcotics—or at least what the officer having that direct line of sight . . . ." Defense counsel raised a hearsay objection at that time, which the court sustained.

Wilson's central argument is about Hernandez saying Taylor handed the money to Wilson. Hernandez did not witness the buy and therefore did not personally see Taylor hand money to Wilson. On cross-examination, Hernandez explained the video showed Taylor get the money from the informant and move his arm toward Wilson. Hernandez said he made a "very good educated guess" that Taylor handed the money to Wilson. Defense counsel asked whether the video showed Wilson reaching for the money and Hernandez said, "No. I think—I think the video turns. So, no." Wilson asserts Hernandez's testimony invaded the province of the jury because Hernandez was no better situated than the jury to determine whether the video showed Taylor handing the money to Wilson.

While Wilson mentions three different statements by Hernandez, his argument primarily applies to Hernandez's first statement that Taylor handed the money to Wilson. Wilson did not object to this statement. Wilson forfeited these claims by failing to make a specific and timely objection in the trial court. (Evid. Code, § 353; *People v. Demetrulias* (2006) 39 Cal.4th 1, 20 (*Demetrulias*).)

24

Wilson claims he did not forfeit this issue because the court overruled his initial objections based on the same line of questioning. He cites two "initial objections" but neither of those objections rendered objections to Hernandez's testimony about Taylor handing money to Wilson futile.

The first overruled objection was about a different line of questioning and the court's ruling on it was proper. The video depicted four buys. The third one involved Wilson. The prosecutor played the video and asked Hernandez to tell her to stop the video when there was a controlled buy. Hernandez told her to stop and said, "Right there is fine. This is the second controlled narcotics purchase. And, again, we're getting live information from our surveillance team of who our informant is meeting with every time." Wilson raised a hearsay objection, which the court properly overruled. Hernandez had not offered any out of court statement; there was no hearsay.

The second overruled objection Wilson cites came *after* Hernandez made the first statement. That ruling cannot support his argument that an earlier objection would have been futile.

Wilson forfeited this claim.

B

Wilson's second forfeited issue is about Hernandez's gang testimony.

Wilson challenges six statements. He says much of this testimony was irrelevant, it was more prejudicial than probative, and it was improper opinion testimony. These statements are in the order in which Hernandez made them at trial.

1) The prosecution asked Hernandez about the condition of the neighborhood before the task force investigation. Hernandez said, "the easiest way to

25

explain [it] was fear." People were scared and intimidated by large groups of gang members wearing gang-affiliated colors and hats. The gangs affected the community's freedom to do things like go shopping without being afraid. Wilson did not object.

2) The Rollin' 40s had a "violent reputation. They're known as a retaliatory criminal street gang." Wilson did not object.

3) The prosecution asked Hernandez whether drug sales affected the community. Hernandez described two incidents in the area. Once, a rival gang shot multiple members of the Rollin' 40s. Hernandez helped capture one of the shooters. In another incident, people fought in the street. Someone who was not part of the gang left and returned with a machete. "And, luckily, I was there and I was able to stop something bad from happening." Hernandez arrested that person for assault with a deadly weapon. Wilson did not object.

4) The prosecution asked how the community felt after the task force investigation. Hernandez said people are more excited about certain businesses. Community members said they are " 'not [] scared to go into the area,' and things like that." Wilson did not object.

5) After Hernandez said the crime rate in the area decreased, the prosecution asked how much it decreased. "I want to say over 10 percent, but I don't recall the number." Wilson objected on hearsay grounds. The court overruled the objection on that

ground but said foundation would be a proper ground.  The court told the prosecutor to lay a foundation.

6) Hernandez disputed Wilson's claim about having a job at a pet store in the shopping complex.  The prosecutor asked why gang members would want to give the appearance of being employed at a certain location.  Hernandez replied that he is an expert on a different gang in the area.  He saw a pattern of members of that gang telling store owners the gang members were going to work in their stores and provide security.  If an owner refused, younger gang members would "steal, vandalize, cause trouble for that owner."  After that, the owner might put the gang member on payroll or pay the gang member cash, depending on the gang member's willingness to act on threats, the owner's relationship with law enforcement, and the owner's level of fear.  Hernandez had seen this pattern "again and again" in other gangs, as well.  Wilson did not object.

Wilson forfeited these claims by failing to make a specific and timely objection in the trial court.  (*Demetrulias, supra*, 39 Cal.4th at p. 20.)  On appeal, he says he "objected several times to the majority of this testimony."  The record does not support this contention.  Of the six statements he challenges, he objected to just one, the fifth statement.  Wilson failed to object to the majority of the statements he challenges.

As to the fifth statement, the court properly denied the objection because the ground Wilson stated, hearsay, did not apply.  The court aided Wilson by suggesting the ground of lack of

27

foundation and telling the prosecution to elicit a foundation. This was not an abuse of discretion.

Wilson did make two objections to Hernandez's gang testimony before the statements he challenges on appeal, but this does not prove objections would have been futile. The first objection was a foundation objection when Hernandez began to talk about what the area was like before the investigation. The court told the prosecution to lay a foundation, and Hernandez testified about his work in the area and the hundreds of times he had been there. The same thing happened when Wilson raised a foundation objection after the prosecution asked how the Rollin' 40s affected the community. This does not prove objections would have been futile.

Fatal to Wilson's appellate claims is his failure to object on the grounds he offers on appeal: relevancy, prejudice greatly outweighing probative value, and improper opinion testimony. In the relevant instances where he did object, he never raised these grounds.

Wilson has forfeited his claims about Hernandez's testimony.

V

Wilson has not demonstrated his counsel was ineffective for failing to object to portions of Hernandez's testimony.

Wilson offers two arguments. He says his counsel should have objected to Hernandez's testimony about the video on the basis of improper opinion testimony. He also says his counsel should have objected to Hernandez's gang testimony, the six statements we laid out in section IV, on the basis of being more prejudicial than probative.

28

A defendant has the burden of proving ineffective assistance of counsel. (*People v. Delgado* (2017) 2 Cal.5th 544, 559.) To establish ineffectiveness, a defendant must show counsel's performance fell below an objective standard of reasonableness and, but for counsel's error, it is reasonably probable there would have been a different result. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688.)

We defer to counsel's reasonable tactical decisions and presume counsel acted within the wide range of reasonable professional assistance. (*Mai*, *supra*, 57 Cal.4th at p. 1009.) Failure to object rarely establishes ineffective legal representation. (*People v. Avena* (1996) 13 Cal.4th 394, 421.) On direct appeal, if the record does not show the reason for counsel's challenged actions or omissions, we affirm the conviction unless there could be no satisfactory explanation. (*People v. Anderson* (2001) 25 Cal.4th 543, 569.)

It is not reasonably probable there would have been a different result had trial counsel objected. As to Hernandez's testimony about the video, the jury viewed the video themselves and defense counsel questioned Hernandez extensively about what the video showed and did not show. Hernandez ultimately agreed the video did not show Wilson reaching for the money and Hernandez said he was making an "educated guess" that Taylor handed Wilson the money. The jury heard the informant's testimony about Taylor handing Wilson the money and viewed the video. The jury could reasonably rely on the informant's testimony about the August sale and, or perhaps instead, could reasonably make the same educated inference as Hernandez about what happened to the money. It is not reasonably probable

the jury would have come to a different conclusion absent Hernandez's testimony.

The same is true of the gang testimony. The court struck the punishment for Wilson's gang enhancement, and Wilson does not challenge the jury's true finding for the gang enhancement on appeal. Given the testimony of the informant and the corroborating video, it is not reasonably probable, absent the gang statements Wilson challenges, that the jury would have found he did not make the August sale.

VI

There is no cumulative error.

**DISPOSITION**

The judgment is affirmed.


WILEY, J.


We concur:



GRIMES, Acting P. J.



STRATTON, J.


.